IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | Chapter 7 |
| | § | |
| **ROOFTOP GROUP USA, INC.,** | § | Case No. 19-32804-hdh-7 |
| | § | |
| Debtor. | § | |

### AFFIDAVIT OF CHRIS CONDON

Before me, the undersigned Notary Public, on this day personally appeared Chris Condon known to me to be the person whose name is subscribed below, who being duly sworn, upon her oath stated:

1.   My name is Chris Condon, I am over 21 years of age, have never been convicted of a felony or crime of moral turpitude, and have personal knowledge of the facts in this affidavit.

2.   I am currently the CEO of TriCon Logistics LLC ("**TriCon**"). I have worked for TriCon since August 2018. I have over 22 years' experience in the logistics industry.

3.   TriCon is a third-party logistics company that provides warehouse storage, distribution, and fulfillment services to its clients.

4.   Rooftop Group USA, Inc. (the "**Debtor**") is a distributor of compact quadcopters, commonly known as "micro-drones."

5.   The Debtor is a customer of TriCon. TriCon provides services to Debtor, including warehouse storage and distribution.

6.   The following exhibits are attached to this affidavit:

   a) Exhibit A is a true and correct copy of a Warehouse and Distribution Services Agreement dated June 27, 2019 (the "**2019 Services Agreement**") between the Debtor and TriCon.

   b) Exhibit B is a true and correct copy of a Warehouse and Distribution

Service Agreement dated April 18, 2017 (the "**2017 Services Agreement**") between the Debtor and TriCon as a successor to Trans-Trade.

c)  Exhibit C is a true and correct copy of the Terms & Condition dated April 18, 2017 between the Debtor and TriCon as a successor to Trans-Trade.

d)  Exhibit D is a true and correct copy the Secured Promissory Note dated May 29, 2019 that the Debtor issued in TriCon's favor (the "**Note**"), which provides TriCon with a lien in the Collateral.

e)  Exhibit E is a true and correct copy of a UCC Financing Statement dated June 12, 2019, which TriCon filed to perfect its liens.

f)  Exhibit F is a true and correct copy of the August 8, 2019 Notice of Private Sale of Stored Goods Under Texas Uniform Commercial Code (the "**Notice of Sale**").

g)  Exhibit G is a true and correct copy of an August 17, 2019 email that TriCon received from Disney Consumer Products.

h)  Exhibit H is a true and correct copy of a true and correct copy of a letter from TriCon's counsel to Disney Consumer Products' counsel dated August 21, 2019.

i)  Exhibit I is a true and correct copy of an August 19, 2019 email from Triumphant Gold Limited's counsel with an attached Temporary Restraining Order dated August 19, 2019.

j)  Exhibit J is a true and copy of an August 20, 2019 letter that TriCon's counsel sent to Triumphant Gold Limited's counsel.

k)  Exhibit K  of a TriCon Statement of Account that reflects the $743,824

owed by the Debtor for unpaid invoices as of August 25, 2019.

7.     TriCon is storing Debtor's inventory of drones (the "**Collateral**") in TriCon's warehouses. Exhibit B to the Notice of Sale (which is attached as Exhibit F to this affidavit) provides a list of the drone inventory that constitutes the Collateral.

8.     The Debtor has failed to pay the amounts due under the service agreements.

9.     The Debtor failed to make the June 14, 2019 payment under the Note.

10.     It is my understanding that under Section 7.209(a) of the Texas Business & Commerce Code, TriCon has a warehouseman lien in the Collateral. The Note also provides TriCon with a lien in the Collateral.

11.     On August 8, 2019, TriCon issued its Notice of Sale, attached as Exhibit F, in which it gave notice that it would foreclose on the Collateral and conduct a private sale on or after August 20, 2019 (the "**UCC Sale**").

12.     TriCon received no objection from any entity entitled to object in advance of the noticed date and time of the sale.

13.     However, two entities who are creditors in the bankruptcies of affiliates of Debtor have asserted interests as follows:

14.     Disney Consumer Products, Inc. ("**DCP**") is a creditor in the Chapter 11 proceeding filed by an international affiliate of the Debtor, Rooftop Group International Pte. Ltd. ("**Rooftop International**"), currently pending in the Fort Worth Division of this Court, under Case No. 19-31443-hdh11.

15.     On August 17, 2019, DCP emailed TriCon's counsel to assert rights under a terminated license agreement with Rooftop International. (Ex. G.)

16.     Through its counsel, TriCon made repeated requests for documentation to support

3

DCP's assertions, but did not receive any documents. On August 21, 2019, TriCon's counsel sent a letter to DCP repeating its request for documentation of DCP's claim. (Ex. H.) DCP did not respond to this letter.

17. Triumphant Gold Limited ("**Triumphant**") is also a creditor of Rooftop International that has asserted an interest in the Debtor's assets. Upon information and belief, Triumphant claims to have a security interest in Debtor's purchase orders, accounts receivable, and credit balances.

18. Upon information and belief, Triumphant has no security interest in the Collateral.

19. On August 19, 2019, Triumphant sent TriCon a copy of a Temporary Restraining Order that Triumphant obtained without notice to either TriCon or the Debtor from a Dallas state court. (Ex. I.) In its email transmitting the Temporary Restraining Order to TriCon, Triumphant asserted that the order enjoined TriCon from proceeding with its UCC Sale. (*Id.*).

20. Triumphant also served TriCon with accelerated discovery in the state court case, seeking extensive documentation from TriCon and a deposition. On information and belief, Triumphant also served discovery on Debtor, including a deposition notice.

21. TriCon voluntarily provided documents to Triumphant, including invoices.

22. On information and belief, because of Triumphant's discovery requests to Debtor and pending temporary injunction hearing, Debtor was forced to commence this bankruptcy case.

23. The Debtor filed this Chapter 7 bankruptcy case on August 25, 2019 (the "**Petition Date**").

24. As of the Petition Date, the Debtor was indebted to TriCon in an amount no less than $743,824. (Ex. K, Statement of Account.)

25. TriCon continues to store the Collateral at significant monthly expense. The

monthly storage fee is over $13,500. The Debtor is not paying TriCon for these ongoing services and has not cured its default for the invoices that are already due and owing. Upon information and belief, Debtor has no cash from which it can pay the expenses of continuing to store the Collateral at TriCon's warehouses.

26.    Upon information and belief, the Collateral is worth less than the amount of TriCon's lien.

27.    The Collateral consists of outdated drones whose value is declining. Upon information and belief, to maximize the sales price of the Collateral, TriCon must sell the Collateral in time for the upcoming holiday season.

28.    Based on my experience in the industry, I do not believe that a buyer would agree purchase the Collateral unless TriCon can sell the Collateral free and clear of the liens and interests of the Debtor's purported creditors, including the alleged interests of DCP and Triumphant.

CHRIS CONDON

SWORN AND SUBSCRIBED before me on this the _____ day of September, 2019.

NOTARY PUBLIC

CHELSEA PAVONA
Notary ID # 129244343
My Commission Expires
December 26, 2020

5



# Warehouse & Distribution Service Agreement

**Rooftop Group USA, Inc.**

5218 Spruce Street
Bellaire, TX 77401
Phone: 416-720-4480
Email: darren@rooftopbrands.com

**TriCon Logistics**
*Corporate Headquarters*

4450 W. Walnut Hill Ln. #100
Irving, TX 75038
Phone: 972-456-1581
Web: www.tricon-logistics.com

**TriCon Logistics**
*Seattle Branch*

2511 70th Avenue East, Suite D
Fife, WA 98424
Phone: 253-345-5180
Web: www.tricon-logistics.com

EPIC. Together.

Empowerment | Professionalism | Integrity | Community

EXHIBIT
A

## Table of Contents

1.  SERVICES FEES AND ASSUMPTIONS ............................................................................... 3
2.  FACILITY ....................................................................................................................... 3
3.  TERM AND TERMINATION ............................................................................................ 3
4.  FEES, CHARGES AND EXPENSES .................................................................................... 4
5.  LATE PAYMENTS .......................................................................................................... 4
6.  TAXES ........................................................................................................................... 4
7.  CHANGES IN OPERATING PARAMETERS OR CONDITIONS ............................................. 4
8.  LIMITATION OF LIABILITY FOR LOSS OR DAMAGE TO GOODS ...................................... 4
9.  FILING OF CLAIMS ........................................................................................................ 5
10. INDEMNIFICATION ....................................................................................................... 5
11. EXCLUSIONS ................................................................................................................. 5
12. CONFIDENTIALITY ........................................................................................................ 6
13. FORCE MAJEURE .......................................................................................................... 6
14. INSURANCE .................................................................................................................. 6
15. INDEPENDENT CONTRACTOR ....................................................................................... 7
16. SUBCONTRACTORS ....................................................................................................... 7
17. HAZARDOUS MATERIALS, DANGEROUS GOODS AND OTHER REGULATED GOODS ........... 7
18. DISPUTE RESOLUTION PROCESS ................................................................................... 7
19. WARRANTIES ............................................................................................................... 8
20. TITLE TO GOODS ........................................................................................................... 8
21. LIEN RIGHTS ................................................................................................................. 8
22. GENERAL PROVISIONS .................................................................................................. 8
23. ENTIRE AGREEMENT ..................................................................................................... 9



This Service Agreement for Fulfillment Distribution Services ("Agreement") is entered into this <u>14</u> day of <u>June</u>, <u>2019</u>, (the "Effective Date") by and between TRICON LOGISTICS. ("TRICON") and <u>Rooftop Group USA, Inc.</u> ("CUSTOMER"). The terms and conditions of this agreement are set forth below. The undersigned client agrees to engage TRICON in its capacity as a 3PL fulfillment agent under the terms and conditions set forth.

## 1.    Services Fees and Assumptions

   a.   Rates – see Schedule "A"

   b.   Scope of Services and Assumptions – see Schedule "B"

## 2.    Facility

The facility is defined as the TRICON Fulfillment Distribution Warehouse located at <u>2511 70th Ave East, Fife WA, 98424</u> ("Facility").

TRICON is required by government entities, the Department of Homeland Security, and the Transportation Security Administration on procedures for allowing **escorted** and **unescorted** access on TRICON properties. All visitors and contractors, while on TRICON property, must agree to comply with the security provisions applicable to such facilities.

TRICON reserves the right to conduct background checks on individuals and companies who require **unescorted** access to TRICON properties. All information obtained will be used to grant **unescorted** access. When **unescorted** access is granted, an identification badge will be issued to the party requesting **unescorted** access. All visitors will be required to sign a visitors log and TRICON Non-Disclosure and Non-Circumvention Agreement as well as show a form of official identification to access the property or employee. After the requesting party's information has been logged and appointment has been confirmed, a visitor badge will be issued. This process will only allow **escorted** access with the TRICON employee.

## 3.    Term and Termination

   a.   <u>Term of Schedule.</u> The term of this Schedule shall commence on the Effective Date and shall continue through <u>June 14, 2020</u>, ("Initial Term"), with two mutual 1 year options, unless earlier terminated, in accordance with the "With Cause" provision outlined in 3b below, or notice with 30 days written notice to terminate by CUSTOMER, in accordance with the "With Out Cause" provision outlined in 3c below.

   b.   <u>Termination Notice.</u>   Termination by either party "With Cause" will be reviewed and measured, in good faith, based on agreed Quarterly Customer Metrics reviews with a scorecard. Termination by CUSTOMER "Without Cause" will be in accordance with 3c below.

   c.   <u>Termination Costs.</u> If this Schedule is terminated (i) by either party due to the other's breach of this Agreement, the non-breaching party shall have all rights and remedies as provided at law and in equity; (ii) by CUSTOMER for its convenience, CUSTOMER shall pay TRICON a termination fee equal to <u>three (3) times the average monthly fee</u>. At that point, TRICON will make any remaining Goods and CUSTOMER-owned materials and equipment available on the Facility's shipping dock for pickup by CUSTOMER or its designee. Or, if CUSTOMER desires TRICON to continue services during the 90 day termination period, current rates and billing terms will apply (in lieu of the termination fee) and TRICON will invoice CUSTOMER the actual amount of billable events at the end of each month.

   d.   <u>Rates for services Rendered.</u> Rates will be reviewed once per year. Any Rate change will be subject to a 30 day written notice by TRICON to CUSTOMER and CUSTOMER's consent to such Rate change.




4

## 4. Fees, Charges and Expenses

Fees will be set forth above and will be administered in accordance with the Description of Services. CUSTOMER shall pay all invoices within thirty (30) days from date of the invoice. CUSTOMER shall pay to TRICON all fees, charges and expenses ("Fees") as specified in this Agreement. TRICON shall invoice CUSTOMER in accordance with the terms set forth in this agreement. If CUSTOMER, in good faith, disputes an amount set forth on an invoice, CUSTOMER shall pay the undisputed amount, and CUSTOMER shall promptly notify TRICON of such dispute and work in good faith with TRICON to promptly resolve the disputed amount. All Fees will be billed and paid in U. S. dollars. Payment of all Fees shall be processed using Automated Clearing House (ACH) transactions as agreed upon by TRICON and CUSTOMER. Except as set forth in an Incorporated Document, the Fees set forth therein may be adjusted at any time by written agreement of the Parties.

## 5. Late Payments

If CUSTOMER fails to make a payment of the undisputed Fees when due, CUSTOMER shall pay to TRICON a late payment charge, which is equal to one and one-half percent (1.5%) of the unpaid amount of such undisputed Fees. Such late payment fee will be charged for any month where CUSTOMER fails to make a payment of the undisputed Fees when due.

## 6. Taxes

CUSTOMER shall pay, indemnify and hold TRICON and its affiliates harmless from and against all sales, use, personal property, gross receipts, excise, franchise and business taxes (including any penalties, fines or interest thereon), except for taxes on revenue or profit earned by TRICON, imposed by any federal, state or local government or taxing authority with respect to the Services performed by TRICON under this Agreement.

## 7. Changes in Operating Parameters or Conditions

CUSTOMER acknowledges and agrees that TRICON calculated the Fees based on and in reliance upon certain key assumptions ("Operating Parameters"). In the event of a change in any Operating Parameter (i.e., a change that is encountered over the course of time and is anticipated to be ongoing) or a "Changed Condition" (as defined below) occurs, which (a) increases the obligations or costs of TRICON or adversely affects the ability of TRICON to perform the Services, or (b) decreases the Fees to which TRICON would otherwise be entitled under the Agreement, TRICON shall provide written notice of the same to CUSTOMER, with such notice specifying in reasonable detail the impact of the change in Operating Parameters or the Changed Condition on the Services and the corresponding change to the then current Fees. The changes to the Fees will become effective ninety (90) days from CUSTOMER's receipt of such notice, unless objected to by CUSTOMER or otherwise agreed in writing by TRICON. In the event CUSTOMER objects to any changes to the Fees made by TRICON pursuant to this Section, CUSTOMER may terminate this agreement on thirty days' written notice to TRICON, prior to the onset of the changed Fees, <u>without</u> payment of any termination fee. "Changed Condition" means (i) the enactment or promulgation of any new law, regulation or charge or any change to any existing law, regulation or charge occurring after the Effective Date, or (ii) a change to any permit, license, lease agreement, consent or approval required to perform the Services in accordance with the terms of the Agreement and occurring after the Effective Date.

## 8. Limitation of Liability for Loss or Damage to Goods

Except for TRICON's gross negligence or intentional misconduct, TRICON's maximum liability to CUSTOMER arising out of or related to loss or damage to Goods will not exceed the amount of the fee(s) charged for the Services, provided that, in the case of a partial loss, such amount will be adjusted, *pro rata*. CUSTOMER and TRICON agree that they have negotiated a reasonable limit of liability based on the value of the Goods and the Parties' respective business interests and rates charged. CUSTOMER may obtain additional protection in excess of the TRICON Standard Liability Limits, up to the actual or declared value of the Goods, shipment or transaction, by written request and payment of an additional charge prior to the provision of Services. Notwithstanding the foregoing, TRICON shall not be liable for delay, loss or damage of any kind, which occurs while Goods are in the care, custody or control of a third party unless otherwise provided in TRICON transportation documents or an Incorporated Document. "Third Party" as used herein includes, but is not limited to, carriers, warehousemen, forwarders, ocean transportation intermediaries, customs brokers, affiliates, brokers or agents to which Goods are entrusted for transportation, handling, delivery and/or storage. CUSTOMER shall bring all claims in connection with acts of a third party against the third party. TRICON shall reasonably cooperate with CUSTOMER regarding such claims. If additional insurance is requested, the respective Party shall seek and provide the additional insurance at their expense.




## 9. Filing of Claims

Unless otherwise set forth or otherwise expressly required by applicable statute, international convention or other mandatory national law, CUSTOMER shall file in writing all claims against TRICON for a potential or actual loss or damage to Goods within one hundred twenty (120) days of the date CUSTOMER receives actual notice of the event giving rise to the claims, or such claims are deemed waived, except that the claims filing requirements set forth in a bill of lading or other transportation document issued in conjunction with the Services apply for claims arising from loss or damage to Goods. CUSTOMER shall file against TRICON all litigation claims under this Agreement within one (1) year from the event giving rise to the claim, or such claims are deemed waived. No settlement will be made on any claim made by CUSTOMER until CUSTOMER has paid all outstanding Fees that are then due and payable under the terms of this agreement.

## 10. Indemnification

a.  <u>General Indemnification.</u> Each Party ("Indemnitor") shall indemnify, defend and hold harmless the other Party and any affiliated and controlling entities of such Party, and the directors, employees, officers, agents, subcontractors, licensors and suppliers of each of them (in each case "Indemnitee") from and against all third party liabilities, claims, suits, demands, actions, fines, damages, losses, costs and expenses (including reasonable attorneys' fees) ("Claims") for injury to or death of any person or damage to or loss of improvements to real property or tangible personal property to the extent caused by or resulting from such Party's negligent acts or omissions or willful misconduct, except to the extent caused by the Indemnitee.

b.  <u>Third Party Claims.</u> CUSTOMER shall indemnify, defend and hold harmless TRICON and its Indemnitees from and against any third party Claim (including any Claim brought by CUSTOMER's customers) arising out of or in connection with the design, manufacture, packaging, marketing, use or sale of the Goods or Services or CUSTOMER's instructions regarding such Goods or Services.

c.  <u>Indemnification Procedures.</u> With respect to a Claim for which indemnification is sought under this Section, the Indemnitee shall provide Indemnitor with a) prompt written notice, b) tender of the defense or settlement, and c) full cooperation in the defense. Failure to give prompt written notice of a Claim will not affect the Indemnitee's right to indemnification unless the failure materially and adversely affects the rights, remedies or liability of the Indemnitor. If the Indemnitor fails to honor a timely request for indemnification and has a binding legal obligation to do so, the Indemnitee shall be entitled to all costs (including reasonable attorneys' fees) incurred in the enforcement of its indemnification rights. The Indemnitor shall not make a compromise or settlement of a Claim without the Indemnitee's consent unless all of the following apply: (i) there is no finding or admission of any violation of law or any violation of any person's rights by Indemnitee, (ii) there is no effect on any other Claim by or against Indemnitee, (iii) the sole relief is monetary damages that are paid by the Indemnitor, and (iv) the compromise or settlement contains an unconditional requirement to provide by the claimant or the plaintiff to the Indemnitee a release from all liability in respect of such Claim. The Indemnitee shall have no liability for any compromise or settlement made without its consent.

## 11. Exclusions

UNLESS DUE TO INTENTIONAL MISCONDUCT, IN NO EVENT WILL EITHER PARTY BE LIABLE TO THE OTHER PARTY FOR ANY PURELY ECONOMIC LOSSES, INCLUDING, BUT NOT LIMITED TO, LOSS OF PROFITS, USE, INCOME, BUSINESS OPPORTUNITIES, COSTS OF ALTERNATIVE MEANS OF TRANSPORT, MERCHANTABILITY, OR CUSTOMER GOODWILL, OR FOR ANY SPECIAL, PUNITIVE, CONSEQUENTIAL OR INDIRECT DAMAGES, IN CONNECTION WITH THIS AGREEMENT OR THE SERVICES PROVIDED HEREUNDER WHETHER OR NOT A PARTY HAS BEEN ADVISED OF SUCH LOSSES OR DAMAGES OR WHETHER PLED UNDER TORT, CONTRACT OR ANY OTHER LEGAL THEORY. TRICON SHALL HAVE NO LIABILITY TO CUSTOMER IN CONNECTION WITH THIS AGREEMENT EXCEPT AS EXPRESSLY SET FORTH IN THIS AGREEMENT. THIS EXCLUSION APPLIES TO DAMAGES OF ANY KIND, INCLUDING BUT NOT LIMITED TO, PERSONAL INJURY AND PROPERTY DAMAGE, WHETHER OR NOT RELATED TO THE GOODS BEING TRANSPORTED.




6

## 12. Confidentiality

As used herein, the term "Confidential Information" means confidential information relating to the business, technology, operations and financial condition of a Party or any information disclosed orally, in writing or by any other medium, by one party (a "Disclosing Party") to the other party (a "Receiving Party") concerning a party's business dealings, customers, prospects, pricing information, operations, affairs, products, intellectual property, or other information of a competitively sensitive or proprietary nature, whether or not identified as confidential or proprietary. For two (2) years from the date of disclosure by a Party of any of its Confidential Information, and in the case of Confidential Information that constitutes a trade secret under applicable law for so long as such Confidential Information remains a trade secret, the Party receiving such Confidential Information will not disclose such Confidential Information except as permitted herein, and that Party shall exercise the same degree of care to avoid disclosure of such Confidential Information as it employs with respect to its own Confidential Information, but not less than reasonable care. Confidential Information does not include such information that: (a) is now, or hereafter becomes publicly known without violation of this Agreement; (b) was known to the recipient prior to the time of disclosure without obligation to preserve confidentiality; (c) was received by the recipient from a third party without obligation to preserve confidentiality; (d) was independently developed by the recipient; (e) is authorized to be disclosed by the disclosing Party; or (f) (i) is contained on the exterior of a package, including information contained in plain text or bar code form on shipping labels, or (ii) package level detail or smart label information, including but not limited to, consignee's full name, complete delivery address, package weight and zone, and package labeling that contains Maxicode, postal barcode, current routing code, appropriate service level icon, a 1Z tracking number bar code and address details related thereto and delivery information (collectively, "Shipping Information"). TRICON shall use Shipping Information only as permitted by the TRICON Privacy Policy located at www.tricon-logistics.com as it may be revised from time to time or as permitted by law. In addition, if the recipient receives a subpoena or other process demanding the disclosure of Party's Confidential Information, the recipient may comply with the demand, in which case the recipient shall inform the disclosing Party and allow the disclosing Party reasonable time to seek a protective order. Furthermore, all visitors will be required to sign a visitor's log and TRICON Non-Disclosure and Non-Circumvention Agreement.

## 13. Force Majeure

If and to the extent that either Party may be reasonably precluded or delayed from performance hereunder by (a) acts of war, acts of public enemies, terrorist attacks, insurrections, riots, sabotage, earthquakes, floods, acts of God, embargoes, authority of laws, labor disputes (including strikes, lockouts job actions, or boycotts) or (b) fires, air conditions, explosives, failure of electrical power, heat, light, air conditioning or communications equipment (provided that the events described in clause (b) are not due to such Party's fault or negligence of the Party claiming relief under this Section) or (c) other extraordinary events beyond its control (each a "Force Majeure Event"), such performance is excused to the extent and for the time necessitated by such Force Majeure Event. This provision does not apply to monetary amounts owed by either Party to the other. TRICON is not liable for any loss or damage to Goods caused by a Force Majeure Event, and CUSTOMER shall have the risk of loss for such loss or damage and the responsibility to insure against the same. If TRICON takes steps outside the ordinary course of business to protect Goods due to a Force Majeure Event, CUSTOMER shall pay the storage or other similar charges associated with TRICON's efforts.

## 14. Insurance

Each Party shall maintain commercial general liability insurance including coverage for the premises and operations, broad form property damage, independent contractors, and contractual liability covering its obligations hereunder for bodily injury and property damage, with a combined single limit of not less than $1,000,000 for each occurrence. In addition, TRICON shall maintain workers' compensation insurance in statutory amounts covering TRICON and its employees, and employer's liability insurance, and CUSTOMER shall maintain, during the term of this Agreement, product liability insurance in an amount not less than $1,000,000 on a per occurrence basis. Each Party shall carry its respective insurance policies with insurance companies licensed to do business in the state(s) where operations are maintained. All policies will provide that such coverage under these policies will not be canceled or materially changed.

TriCon 
Customer

Copyright © 2018 TriCon Logistics
Commercial, Confidential & Proprietary Information
All document versions are controlled electronically. All paper copies will be considered uncontrolled.



## 15. Independent Contractor

TRICON is an independent contractor under this Agreement. Each Party shall comply with all payroll tax withholdings, social security, unemployment and related employer obligations applicable to it. Except as set forth in a duly authorized Power of Attorney, neither Party may hold itself out as an agent of or in a joint venture with the other Party, and neither Party may act on behalf of the other Party.

## 16. Subcontractors

TRICON may subcontract all or portions of the Services to its parent, affiliates or third party service providers. TRICON may disclose to its parent, affiliates or third party service providers any CUSTOMER Confidential Information necessary to perform the Services and as permitted by the TRICON Privacy Policy in effect at the time of performance, which is located at www.tricon-logistics.com. In addition, all visitors will be required to sign a visitor's log and TRICON Non-Disclosure and Non-Circumvention Agreement.

## 17. Hazardous Materials, Dangerous Goods and Other Regulated Goods

Unless TRICON expressly agrees in a Schedule, TRICON will not handle, receive, accept, ship, carry, dispose of, transport, store, or arrange for the handling, disposal, storage or transportation of: (a) any type of hazardous materials, dangerous goods, or Goods containing hazardous materials or dangerous goods, or (b) any type of Goods, which may be regulated by a governmental body, entity or agency, including but not limited to those Goods, which are regulated by the United States Food and Drug Administration, the United States Department of Agriculture, the United States Drug Enforcement Administration, the United States Bureau of Alcohol, Tobacco, Firearms and Explosives, and analogous regulatory agencies in countries in which the Services are provided (collectively, "Hazardous, Dangerous or Regulated Goods"). CUSTOMER warrants and covenants that it will not itself or through others offer, present or otherwise tender any Hazardous, Dangerous or Regulated Goods to TRICON, its affiliates, assignees, agents or subcontractors under this Agreement. Notwithstanding the foregoing, TRICON may take any action that TRICON, in its sole discretion, deems appropriate or necessary in relation to any actual or suspected Hazardous, Dangerous or Regulated Goods. CUSTOMER hereby fully and completely releases and forever discharges and indemnifies TRICON and its customers against all Claims arising out of or caused by actual or suspected Hazardous, Dangerous or Regulated Goods. CUSTOMER shall indemnify, defend, and hold harmless TRICON and its Customers from and against all Claims related to or arising out of any TRICON action taken in relation to such actual or suspected Hazardous, Dangerous or Regulated Goods, CUSTOMER's noncompliance with applicable laws and regulations, or the breach of any covenant of CUSTOMER contained in or made pursuant to this Section.

## 18. Dispute Resolution Process

The Parties agree to utilize the dispute resolution process to resolve any disputes, claim or question between them with respect to this Agreement ("Dispute") as expeditiously as possible, unless injunctive relief is needed, in which case the Parties may apply to a court of competent jurisdiction for such injunctive relief. The Parties shall keep confidential, except as may be required by law, all aspects of the Dispute and the Dispute resolution process. One Party shall give written notice to the other Party of the Dispute and request commencement of the Dispute resolution process. Then, the project managers from each Party shall meet within fifteen (15) business days to negotiate and use commercially reasonable efforts to promptly reach a resolution of the Dispute. If the Dispute is not resolved by the project managers within such fifteen (15) day period, either Party may give notice to the other Party that the Dispute must be escalated to the senior officers of each Party, who will meet within fifteen (15) business days to negotiate and use commercially reasonable efforts to resolve the Dispute. In the event the senior officers are unable to resolve the Dispute within sixty (60) days (unless the Parties mutually agree to extend their discussions) either Party may pursue any remedies that may be available at law or in equity.




8

## 19. Warranties

ANY WARRANTIES OF THE PARTIES EXPRESSLY SET FORTH IN THIS AGREEMENT ARE THE SOLE WARRANTIES MADE BY THE PARTIES AND ARE IN LIEU OF ALL OTHER WARRANTIES, EXPRESS, IMPLIED, OR STATUTORY, INCLUDING BUT NOT LIMITED TO IMPLIED WARRANTIES OF MERCHANTABILITY, OF TITLE OR NONINFRINGEMENT, OF FITNESS FOR A PARTICULAR PURPOSE, OR ARISING FROM COURSE OF PERFORMANCE, COURSE OF DEALING, OR USAGE OF TRADE. IN ANY JURISDICTION, WHICH DOES NOT ALLOW THE EXCLUSION OR LIMITATION OF IMPLIED WARRANTIES, ANY IMPLIED WARRANTIES, TO THE MAXIMUM EXTENT PERMITTED BY THE APPLICABLE LAWS OF ANY SUCH JURISDICTION, SHALL BE LIMITED TO THE TERM OF THIS AGREEMENT. EXCEPT TO THE EXTENT EXPRESSLY PROVIDED IN THE APPLICABLE SCHEDULE, CUSTOMER'S SOLE REMEDY FOR BREACH OF ANY SUCH WARRANTY SHALL BE LIMITED TO THE REPERFORMANCE OF THE SERVICE AT ISSUE.

## 20. Title to Goods

Title to the Goods shall remain at all time with CUSTOMER. Notwithstanding anything herein to the contrary, nothing in this Agreement may be deemed to waive or otherwise limit any lien rights that TRICON may have under applicable law with respect to the Goods.

## 21. Lien Rights

Nothing in this Agreement or in any incorporated document shall be deemed to waive or otherwise limit any lien rights that TRICON may have under applicable law with respect to the Goods.

## 22. General Provisions

a. <u>Assignment; Third Party Beneficiaries.</u> The rights and obligations under this Agreement may not be transferred or assigned to a third party by either Party without the prior written consent of the other Party; provided however, TRICON may transfer or assign all or part of its rights and/or obligations of this Agreement to one or more of its parent or affiliates. Under no circumstances may CUSTOMER resell any of the Services to any third party without the express written consent of TRICON. There are no third party beneficiaries under this Agreement, except that TRICON's affiliates that perform Services are third party beneficiaries of TRICON's rights, remedies and benefits under this Agreement.

b. <u>Amendments; Waiver; Severability.</u> This Agreement can only be modified or amended by a written instrument signed by the Parties. A waiver of any right by either Party will not constitute a waiver of such right on any subsequent occasion. Acceptance by TRICON of the amounts (or lesser amounts) payable under this Agreement is not to be deemed a waiver of any default. If any provision of this Agreement is determined to be invalid, such invalidity will not affect the validity of the remaining portions of this Agreement.

c. <u>Survival.</u> Upon any expiration or termination of this Agreement for any reason, all rights and obligations of the parties under this Agreement shall cease except for such provisions, which, by their terms, are intended to survive the termination of this Agreement.

d. <u>Controlling Law.</u> This Agreement is governed by the laws of the State of Texas without regard to conflicts of laws provisions.

e. <u>No Use of Trademarks.</u> Neither Party may use the other Party's or its affiliates' name, logo, trademarks, service marks or trade names without the other Party's prior written consent; provided however, TRICON may disclose CUSTOMER's name as a reference to any current or prospective customer. CUSTOMER may disclose TRICON's name as a reference to any current or prospective customer.

f. <u>Non-Solicitation of Personnel.</u> During the term of this Agreement and for two (2) years after its expiration or termination, neither Party may actively solicit the employment of any employee of the other Party, which employee was engaged in the performance of this Agreement. Notwithstanding the foregoing, neither Party may be precluded from conducting general recruiting activities, such as participating in job fairs or publishing advertisements for general circulation. If the soliciting Party violates this Section, then such Party shall pay to the other Party an amount equal to one (1) year's salary for any solicited employee as liquidated damages. The amount of annual salary will be the annual salary in effect at the date the employee was solicited. The Parties agree that such amount is a reasonable estimate of the damages to be suffered by the aggrieved Party in such an event, which damages would be difficult to ascertain, and that such amount is not intended to be a penalty.

g. <u>Intellectual Property Rights.</u> CUSTOMER and TRICON acknowledge that the other has certain intellectual property rights that may be revealed or provided to the other Party in accordance with this Agreement. Each Party acknowledges that this Agreement does not grant any right or title of ownership in their respective intellectual property rights to the other unless specifically provided in this Agreement. Any intellectual property remains the originator's property unless otherwise provided herein.

TriCon 
Customer

Copyright © 2018 TriCon Logistics
Commercial, Confidential & Proprietary Information
All document versions are controlled electronically. All paper copies will be considered uncontrolled.



h. **No Breach of Other Agreements.** CUSTOMER and TRICON each respectively represent and warrant that its execution of this Agreement does not violate any applicable law or breach any other agreement to which it is a Party or is otherwise bound.

i. **Notice.** Except where specifically provided otherwise, any notice required or permitted shall be deemed to have been duly given if (a) delivered by hand and receipted for by the party to whom such notice or communication was directed; (b) mailed by certified or registered mail with postage prepaid, on the third business day following the day on which it is mailed; (c) mailed by reputable overnight courier (such as Fedex) and receipted for by the party to whom such notice or communication was directed, addressed as follows:

|  |  |  |  |
|---|---|---|---|
| To: | TRICON LOGISTICS LLC | To: | Rooftop Group USA, Inc. (CUSTOMER) |
|  | Contracts and Compliance Department |  | Darren Matloff |
|  | P.O. Box 612369 |  | 5218 Spruce Street |
|  | 4450 W. Walnut Hill Ln. #100 |  | Bellaire, TX 77401 |
|  | Irving, TX 75038 |  |  |

## 23. Entire Agreement

This Agreement sets forth the full and complete understanding of the Parties with respect to the matters herein and supersedes any and all agreements and representations between the Parties made or dated prior to the Effective Date, including any agreements regarding confidentiality.

In the event of any inconsistency between the terms and conditions of this Agreement and the terms and conditions of that certain Promissory Note between the parties dated May 29, 2019 (the "Note"), the terms and conditions of the Note shall prevail.

IN WITNESS WHEREOF, the Parties hereto have caused this Schedule to be executed by their duly authorized representatives as of the Effective Date.

| **TRICON LOGISTICS LLC** | **ROOFTOP GROUP USA** |
|---|---|
| *(signature)* | *Darren Matloff* |
| **Signature** | **Signature** |
| *Chris Condon* | Darren Matloff |
| **Printed Name** | **Printed Name** |
| *CEO* | CEO |
| **Title** | **Title** |
| 6/27/2019 | Jun 27, 2019 |
| **Date** | **Date** |


Copyright © 2018 TriCon Logistics
Commercial, Confidential & Proprietary Information
All document versions are controlled electronically. All paper copies will be considered uncontrolled.



# Schedule A

### Fees

| | |
|---|---|
| **Drayage** | **$230 +FSC+Chassis+Bobtail.**<br>**$75/hour wait time** |
| **Devan/Unloading** | **$250 40' Ocean Container**<br>**$200 LCL** |
| **Receipt Storage** | **$7.25 per pallet** |
| **Recurring Storage** | **$7.25 per pallet** |
| **Work Order Processing Fee** | **$7.50 per FTL/LTL order**<br>**$2.75 per UPS/FedEx** |
| **Outbound Fee** | **$5.75 per pallet**<br>**$0.20 per each** |
| **Palletize/Wrap** | **$10.25 per pallet** |
| **Labeling** | **$0.20 per label** |
| **Seal (if required)** | **$5 per trailer** |
| **Out of scope labor** | **$35 per man-hour**<br>**$52.50 per overtime hour** |
| **Supplies** | **Cost Plus 16%** |

TriCon _____
Customer _____

Copyright © 2018 TriCon Logistics
Commercial, Confidential & Proprietary Information
All document versions are controlled electronically. All paper copies will be considered uncontrolled.



11

# Schedule B

## Scope of Services & Assumptions

Receiving:
- Receipt of floor loaded ocean containers
- Containers typically arrive without manifest
- Average cartons per container = 1,600
- Palletize freight by sku
- Putaway in bulk or rack locations
- Bulk product can be stacked 3 high
- Standard Pallet = 48*40*50

Orders:
- Outbound small pack orders received via EDI integration
- Outbound FTL/LTL orders received via spreadsheet.  Spreadsheet is augmented for upload into Cargowise
- Outbound orders are a combination of small pack and LTL/FTL shipments
- Orders expected to ship within 24 hours of order receipt except when routed by consignee.

Storage:
- Bulk and Rack Locations utilized

Shipments:
- Mostly LTL shipments
- Rooftop to coordinate/Route LTL and FTL shipments – spreadsheet sent to Tricon with routing information
- Small Pack shipments on Tricon's account

TriCon 
Customer

Copyright © 2018 TriCon Logistics
Commercial, Confidential & Proprietary Information
All document versions are controlled electronically. All paper copies will be considered uncontrolled.







# Warehouse and Distribution
# Service Agreement

### Rooftop Brands (DBA)

Rooftop Group USA, INC

Phone: 416-720-4480
Fax: 949-271-3614
Email: anita@rooftopbrands.com
Web: propelsw.com

### Trans-Trade, Inc.

*Corporate Headquarters*

1040 Trade Avenue, Suite 106
DFW Airport, Texas USA 75261
Phone: 972-456-1581
        800-880-8173 (toll free)
Fax: 972-456-1555
Email:
Web: www.transtrade.com

### Trans-Trade, Inc.

*Fife*

*2511 70th Ave E Suite "D"*
Fife, Washington 98424

Phone: 253-345-5180
Fax: 253-345-5181
Email: pwalsh@transtrade.com
Web: www.transtrade.com

**EXHIBIT B**

Copyright ©2015 – Trans-Trade, Inc.
Commercial, Confidential & Proprietary Information
All document versions are controlled electronically. All paper copies will be considered uncontrolled.

DC#: ADMFO00046
Version: 5.0
Effective Date: 7/29/2015

# Table of Contents

1.  Services Fees and Assumptions ..................................................................................1

2.  Facility ...................................................................................................................1

3.  Term and Termination ..............................................................................................1

4.  Fees, Charges and Expenses .......................................................................................1

5.  Late Payments .........................................................................................................2

6.  Taxes .....................................................................................................................2

7.  Changes in Operating Parameters or Conditions .............................................................2

8.  Limitation of Liability for Loss or Damage to Goods .......................................................2

9.  Filing of Claims .......................................................................................................3

10.  Indemnification .......................................................................................................3

11.  Exclusions ..............................................................................................................3

12.  Confidentiality ........................................................................................................4

13.  Force Majeure .........................................................................................................4

14.  Insurance ...............................................................................................................4

15.  Independent Contractor .............................................................................................4

16.  Subcontractors ........................................................................................................5

17.  Hazardous Materials, Dangerous Goods and Other Regulated Goods ..................................5

18.  Dispute Resolution Process ........................................................................................5

19.  Warranties .............................................................................................................5

20.  Title to Goods .........................................................................................................5

21.  Lien Rights ............................................................................................................5

22.  General Provisions ...................................................................................................6

23.  Entire Agreement ....................................................................................................6

Copyright ©2015 – Trans-Trade, Inc.

Commercial, Confidential & Proprietary Information

All document versions are controlled electronically. All paper copies will be considered uncontrolled.

DC#: ADMFO00046

Version: 5.0

Effective Date: 7/29/2015

This Service Agreement for Fulfillment Distribution Services ("Agreement") is entered into this _16_ day of _April_ _2017_ (the "Effective Date") by and between TRANS-TRADE, INC. ("TRANS-TRADE") and _Rooted Plants_ ("CUSTOMER"). The terms and conditions of this agreement are set forth below. The undersigned client agrees to engage TRANS-TRADE in its capacity as a 3PL fulfillment agent under the terms and conditions set forth.

## 1. Services Fees and Assumptions

   a.   Rates – see Schedule "A"

   b.   Scope of Services and Assumptions – see Schedule "B"

## 2. Facility

The facility is defined as the TRANS-TRADE Fulfillment Distribution Warehouse located at <u>2511 70th Ave E Suite "D" Fife, WA 98424</u>("Facility").

TRANS-TRADE is required by government entities, the Department of Homeland Security, and the Transportation Security Administration on procedures for allowing <u>**escorted**</u> and <u>**unescorted**</u> access on TRANS-TRADE properties. All visitors and contractors, while on TRANS-TRADE property, must agree to comply with the security provisions applicable to such facilities.

TRANS-TRADE reserves the right to conduct background checks on individuals and companies who require <u>**unescorted**</u> access to TRANS-TRADE properties. All information obtained will be used to grant <u>**unescorted**</u> access. When <u>**unescorted**</u> access is granted, an identification badge will be issued to the party requesting <u>**unescorted**</u> access. All visitors will be required to sign a visitors log and TRANS-TRADE Non-Disclosure and Non-Circumvention Agreement as well as show a form of official identification to access the property or employee. After the requesting party's information has been logged and appointment has been confirmed, a visitor badge will be issued. This process will only allow <u>**escorted**</u> access with the TRANS-TRADE employee.

## 3. Term and Termination

   a.   <u>Term of Schedule.</u> The term of this Schedule shall commence on the Effective Date and shall continue through <u>month to month,</u> ("Initial Term"), unless earlier terminated in accordance "With Cause" outlined in 3b below or notice with 30 days written notice to terminate by CUSTOMER in accordance to  "With Out Cause" outlined in 3c below.

   b.   <u>Termination Notice.</u>  Termination by either party "With Cause" will be reviewed and measured based on agreed Quarterly Customer Metrics reviews with a scorecard. Termination by CUSTOMER "Without Cause" will be in accordance with 5c below.

   c.   <u>Termination Costs.</u> If this Schedule is terminated (i) by TRANS-TRADE due to CUSTOMER's breach, failure to make payments (over 30 days late), or insolvency or (ii) by CUSTOMER for its convenience, CUSTOMER shall pay TRANS-TRADE a termination fee equal to <u>storage and handling fees owed</u>. At that point, TRANS-TRADE will make any remaining Goods and CUSTOMER-owned materials and equipment available on the Facility's shipping dock for pickup by CUSTOMER or its designee. Or, if CUSTOMER desires TRANS-TRADE to continue services during the 30 day termination period, current rates and billing terms will apply. Whereby, TRANS-TRADE will invoice CUSTOMER the actual amount of billable events at the end of each month, or 1/3 of the termination fee, whichever is higher.

   d.   <u>Rates for services Rendered.</u> Rates will be reviewed at least once per year, but no more than twice per year.  Any Rate change will have a 90 day written notice by TRANS-TRADE allowing CUSTOMER to make necessary arrangement.

## 4. Fees, Charges and Expenses

Fees will be set forth above and will be administered in accordance with the Description of Services. CUSTOMER shall pay all invoices within ten (10) days from date of the invoice. CUSTOMER shall pay to TRANS-TRADE all fees, charges and expenses ("Fees") as specified in this Agreement, with no right of set-off for any claim filed against TRANS-TRADE. TRANS-TRADE shall invoice CUSTOMER in accordance with the terms set forth in this agreement. If CUSTOMER in good faith disputes an amount set forth on an invoice, CUSTOMER shall pay the undisputed amount, and CUSTOMER shall promptly notify TRANS-TRADE of such dispute and work in good faith with TRANS-TRADE to promptly resolve the disputed amount. All Fees will be billed and paid in U. S. dollars. Payment of all Fees shall be processed using Automated Clearing House (ACH) transactions as agreed upon by TRANS-TRADE and CUSTOMER. Except as set forth in an incorporated Document, the Fees set forth therein may be adjusted at any time by written agreement of the Parties.

Copyright ©2015 – Trans-Trade, Inc.
Commercial, Confidential & Proprietary Information
All document versions are controlled electronically. All paper copies will be considered uncontrolled.

DC#: ADMF000046
Version: 5.0
Effective Date: 7/29/2015

**Warehouse and Distribution Service Agreement**                                   Page 2

## 5. Late Payments

If CUSTOMER fails to make a payment of the undisputed Fees when due, CUSTOMER shall pay to TRANS-TRADE a late payment charge, which is equal to one and one-half percent (1.5%) of the unpaid amount of such undisputed Fees. Such late payment fee will be charged for any month where CUSTOMER fails to make a payment of the undisputed Fees when due.

## 6. Taxes

CUSTOMER shall pay, indemnify and hold TRANS-TRADE and its affiliates harmless from and against all sales, use, personal property, gross receipts, excise, franchise and business taxes (including any penalties, fines or interest thereon), except for taxes on revenue earned by TRANS-TRADE, imposed by any federal, state or local government or taxing authority with respect to the Services performed by TRANS-TRADE under this Agreement.

## 7. Changes in Operating Parameters or Conditions

CUSTOMER acknowledges and agrees that TRANS-TRADE calculated the Fees based on and in reliance upon certain key assumptions ("Operating Parameters"). In the event of a change in any Operating Parameter (i.e., a change that is encountered over the course of time and is anticipated to be ongoing) or a "Changed Condition" (as defined below) occurs, which (a) increases the obligations or costs of TRANS-TRADE or adversely affects the ability of TRANS-TRADE to perform the Services, or (b) decreases the Fees to which TRANS-TRADE would otherwise be entitled under the Agreement, TRANS-TRADE shall provide written notice of the same to CUSTOMER, with such notice specifying in reasonable detail the impact of the change in Operating Parameters or the Changed Condition on the Services and the corresponding change to the then current Fees. The changes to the Fees will become effective ninety (90) days from CUSTOMER's receipt of such notice unless otherwise agreed in writing by TRANS-TRADE, and the Agreement will be deemed amended accordingly without any further action by the Parties. In the event CUSTOMER objects to any changes to the Fees made by TRANS-TRADE pursuant to this Section, CUSTOMER may terminate this agreement for convenience pursuant to and in accordance with Section 3 (above). "Changed Condition" means (i) the enactment or promulgation of any new law, regulation or charge or any change to any existing law, regulation or charge occurring after the Effective Date, or (ii) a change to any permit, license, lease agreement, consent or approval required to perform the Services in accordance with the terms of the Agreement and occurring after the Effective Date. TRANS-TRADE shall not be responsible for any liability for failure to meet performance commitments due to a Changed Condition or a change in an Operating Parameter, unless TRANS-TRADE specifically agrees in writing to the contrary.

## 8. Limitation of Liability for Loss or Damage to Goods

TRANS-TRADE's maximum liability to CUSTOMER arising out of or related to loss or damage to Goods will not exceed the TRANS-TRADE standard liability amounts, which are as follows (the "TRANS-TRADE Standard Liability Limits"): (a) for Claims arising from TRANS-TRADE's warehousing, fulfillment and consolidation Services occurring in TRANS-TRADE's facilities or premises, including owned or leased property, $0.50 per pound; (b) for Claims arising from TRANS-TRADE's customs brokerage Services, $50 per entry or the amount of brokerage fees paid to TRANS-TRADE related to the entry, whichever is less; (c) for Claims arising from TRANS-TRADE's freight forwarding or motor broker Services, including arranging for inland or air transportation, $50 per shipment; and (d) for Claims arising from air, ground or ocean transportation, the liability limits set forth in the bills of lading, air waybills, or other transportation documents issued in conjunction with the Services; provided, however, if a bill of lading or other transportation document issued in conjunction with ground transportation Services does not include a liability limit, TRANS-TRADE's liability limit is $0.50 per pound. CUSTOMER and TRANS-TRADE agree that they have negotiated a reasonable limit of liability based on the value of the Goods and the Parties' respective business interests and rates charged. CUSTOMER may obtain additional protection in excess of the TRANS-TRADE Standard Liability Limits, up to the actual or declared value of the Goods, shipment or transaction, by written request and payment of an additional charge prior to the provision of Services. CUSTOMER waives all rights of subrogation on behalf of its insurers for any loss or damage in excess of the TRANS-TRADE Standard Liability Limits set forth herein. Notwithstanding the foregoing, TRANS-TRADE shall not be liable for delay, loss or damage of any kind, which occurs while Goods are in the care, custody or control of a third party unless otherwise provided in TRANS-TRADE transportation documents or an Incorporated Document. "Third Party" as used herein includes, but is not limited to, carriers, warehousemen, forwarders, ocean transportation intermediaries, customs brokers, affiliates, brokers or agents to which Goods are entrusted for transportation, handling, delivery and/or storage. CUSTOMER shall bring all claims in connection with acts of a third party against the third party. TRANS-TRADE shall reasonably cooperate with CUSTOMER regarding such claims. If additional insurance is requested, the respective Party shall seek and provide the additional insurance at their expense.

Copyright ©2015 – Trans-Trade, Inc.
Commercial, Confidential & Proprietary Information
All document versions are controlled electronically. All paper copies will be considered uncontrolled.

DC#: ADMFO00046
Version: 6.0
Effective Date: 7/29/2015

## 9. Filing of Claims

Unless otherwise set forth or otherwise expressly required by applicable statute, international convention or other mandatory national law, CUSTOMER shall file in writing all claims against TRANS-TRADE for a potential or actual loss or damage to Goods within thirty (30) days from the event giving rise to the claims, or such claims are deemed waived, except that the claims filing requirements set forth in a bill of lading or other transportation document issued in conjunction with the Services apply for claims arising from loss or damage to Goods. CUSTOMER shall file against TRANS-TRADE all litigation claims under this Agreement within one (1) year from the event giving rise to the claim, or such claims are deemed waived. No settlement will be made on any claim made by CUSTOMER until CUSTOMER has paid all outstanding Fees.

## 10. Indemnification

a. <u>General Indemnification.</u> Each Party ("Indemnitor") shall indemnify, defend and hold harmless the other Party and any affiliated and controlling entities of such Party, and the directors, employees, officers, agents, subcontractors, licensors and suppliers of each of them (in each case "Indemnitee") from and against all third party liabilities, claims, suits, demands, actions, fines, damages, losses, costs and expenses (including reasonable attorneys' fees) ("Claims") for injury to or death of any person or damage to or loss of improvements to real property or tangible personal property to the extent caused by or resulting from such Party's negligent acts or omissions or willful misconduct, except to the extent caused by the Indemnitee. Notwithstanding the foregoing or anything in the Agreement to the contrary, TRANS-TRADE shall have no indemnification obligation under this Section or under the Agreement arising out of or in connection with CUSTOMER's goods, packages or property for which the Services are provided (collectively the "Goods"), the liability for which is governed by Section 10 hereunder.

b. <u>Third Party Claims.</u> CUSTOMER shall indemnify, defend and hold harmless TRANS-TRADE and its Indemnitees from and against any third party Claim (including any Claim brought by CUSTOMER's customers) arising out of or in connection with the design, manufacture, packaging, marketing, use or sale of the Goods or Services or CUSTOMER's instructions regarding such Goods or Services.

c. <u>Indemnification Procedures.</u> With respect to a Claim for which indemnification is sought under this Section, the Indemnitee shall provide Indemnitor with a) prompt written notice, b) tender of the defense or settlement, and c) full cooperation in the defense. Failure to give prompt written notice of a Claim will not affect the Indemnitee's right to indemnification unless the failure materially and adversely affects the rights, remedies or liability of the Indemnitor. If the Indemnitor fails to honor a timely request for indemnification and has a binding legal obligation to do so, the Indemnitee shall be entitled to all costs (including reasonable attorneys' fees) incurred in the enforcement of its indemnification rights. The Indemnitor shall not make a compromise or settlement of a Claim without the Indemnitee's consent unless all of the following apply: (i) there is no finding or admission of any violation of law or any violation of any person's rights by Indemnitee, (ii) there is no effect on any other Claim by or against Indemnitee, (iii) the sole relief is monetary damages that are paid by the Indemnitor, and (iv) the compromise or settlement contains an unconditional requirement to provide by the claimant or the plaintiff to the Indemnitee a release from all liability in respect of such Claim. The Indemnitee shall have no liability for any compromise or settlement made without its consent.

## 11. Exclusions

IN NO EVENT WILL EITHER PARTY BE LIABLE TO THE OTHER PARTY FOR ANY PURELY ECONOMIC LOSSES, INCLUDING, BUT NOT LIMITED TO, LOSS OF PROFITS, USE, INCOME, BUSINESS OPPORTUNITIES, COSTS OF ALTERNATIVE MEANS OF TRANSPORT, MERCHANTABILITY, OR CUSTOMER GOODWILL, OR FOR ANY SPECIAL, PUNITIVE, CONSEQUENTIAL OR INDIRECT DAMAGES, IN CONNECTION WITH THIS AGREEMENT OR THE SERVICES PROVIDED HEREUNDER WHETHER OR NOT A PARTY HAS BEEN ADVISED OF SUCH LOSSES OR DAMAGES OR WHETHER PLED UNDER TORT, CONTRACT OR ANY OTHER LEGAL THEORY. TRANS-TRADE SHALL HAVE NO LIABILITY TO CUSTOMER IN CONNECTION WITH THIS AGREEMENT EXCEPT AS EXPRESSLY SET FORTH IN THIS AGREEMENT. THIS EXCLUSION APPLIES TO DAMAGES OF ANY KIND, INCLUDING BUT NOT LIMITED TO, PERSONAL INJURY AND PROPERTY DAMAGE, WHETHER OR NOT RELATED TO THE GOODS BEING TRANSPORTED.

Copyright ©2015 – Trans-Trade, Inc.
Commercial, Confidential & Proprietary Information
All document versions are controlled electronically. All paper copies will be considered uncontrolled.

DC#: ADMF000046
Version: 5.0
Effective Date: 7/29/2015

## 12. Confidentiality

As used herein, the term "Confidential Information" means confidential information relating to the business, technology, operations and financial condition of a Party or any information disclosed orally, in writing or by any other medium, by one party (a "Disclosing Party") to the other party (a "Receiving Party") concerning a party's business dealings, customers, prospects, pricing information, operations, affairs, products, intellectual property, or other information of a competitively sensitive or proprietary nature, whether or not identified as confidential or proprietary. For two (2) years from the date of disclosure by a Party of any of its Confidential Information, and in the case of Confidential Information that constitutes a trade secret under applicable law for so long as such Confidential Information remains a trade secret, the Party receiving such Confidential Information will not disclose such Confidential Information except as permitted herein, and that Party shall exercise the same degree of care to avoid disclosure of such Confidential Information as it employs with respect to its own Confidential Information, but not less than reasonable care. Confidential Information does not include such information that: (a) is now, or hereafter becomes publicly known without violation of this Agreement; (b) was known to the recipient prior to the time of disclosure without obligation to preserve confidentiality; (c) was received by the recipient from a third party without obligation to preserve confidentiality; (d) was independently developed by the recipient; (e) is authorized to be disclosed by the disclosing Party; or (f) (i) is contained on the exterior of a package, including information contained in plain text or bar code form on shipping labels, or (ii) package level detail or smart label information, including but not limited to, consignee's full name, complete delivery address, package weight and zone, and package labeling that contains Maxicode, postal barcode, current routing code, appropriate service level icon, a 1Z tracking number bar code and address details related thereto and delivery information (collectively, "Shipping Information"). TRANS-TRADE shall use Shipping Information only as permitted by the TRANS-TRADE Privacy Policy located at www.transtrade.com as it may be revised from time to time or as permitted by law. In addition, if the recipient receives a subpoena or other process demanding the disclosure of Party's Confidential Information, the recipient may comply with the demand, in which case the recipient shall inform the disclosing Party and allow the disclosing Party reasonable time to seek a protective order. Furthermore, all visitors will be required to sign a visitors log and TRANS-TRADE Non-Disclosure and Non-Circumvention Agreement.

## 13. Force Majeure

If and to the extent that either Party may be precluded or delayed from performance hereunder by (a) acts of war, acts of public enemies, terrorist attacks, insurrections, riots, sabotage, earthquakes, floods, acts of God, embargoes, authority of laws, labor disputes (including strikes, lockouts job actions, or boycotts) or (b) fires, air conditions, explosives, failure of electrical power, heat, light, air conditioning or communications equipment (provided that the events described in clause (b) are not due to such Party's fault or negligence of the Party claiming relief under this Section 9) or (c) other events beyond its control (each a "Force Majeure Event"), such performance is excused to the extent and for the time necessitated by such Force Majeure Event. This provision does not apply to monetary amounts owed by either Party to the other. TRANS-TRADE is not liable for any loss or damage to Goods caused by a Force Majeure Event, and CUSTOMER shall have the risk of loss for such loss or damage and the responsibility to insure against the same. If TRANS-TRADE takes steps outside the ordinary course of business to protect Goods due to a Force Majeure Event, CUSTOMER shall pay the storage or other similar charges associated with TRANS-TRADE's efforts.

## 14. Insurance

Each Party shall maintain commercial general liability insurance including coverage for the premises and operations, broad form property damage, independent contractors, and contractual liability covering its obligations hereunder for bodily injury and property damage, with a combined single limit of not less than $1,000,000 for each occurrence. In addition, TRANS-TRADE shall maintain workers' compensation insurance in statutory amounts covering TRANS-TRADE and its employees, and employer's liability insurance, and CUSTOMER shall maintain, during the term of this Agreement, product liability insurance in an amount not less than $1,000,000 on a per occurrence basis. Each Party shall carry its respective insurance policies with insurance companies licensed to do business in the state(s) where operations are maintained. All policies will provide that such coverage under these policies will not be canceled or materially changed.

## 15. Independent Contractor

TRANS-TRADE is an independent contractor under this Agreement. Each Party shall comply with all payroll tax withholdings, social security, unemployment and related employer obligations applicable to it. Except as set forth in a duly authorized Power of Attorney, neither Party may hold itself out as an agent of or in a joint venture with the other Party, and neither Party may act on behalf of the other Party.

Copyright ©2015 – Trans-Trade, Inc.
Commercial, Confidential & Proprietary Information
All document versions are controlled electronically. All paper copies will be considered uncontrolled.

DO#: ADMFO00046
Version: 5.0
Effective Date: 7/29/2015

## 16. Subcontractors

TRANS-TRADE may subcontract all or portions of the Services to its parent, affiliates or third party service providers. TRANS-TRADE may disclose to its parent, affiliates or third party service providers any CUSTOMER Confidential Information necessary to perform the Services and as permitted by the TRANS-TRADE Privacy Policy in effect at the time of performance, which is located at www.transtrade.com. In addition, all visitors will be required to sign a visitors log and TRANS-TRADE Non-Disclosure and Non-Circumvention Agreement.

## 17. Hazardous Materials, Dangerous Goods and Other Regulated Goods

Unless TRANS-TRADE expressly agrees in a Schedule, TRANS-TRADE will not handle, receive, accept, ship, carry, dispose of, transport, store, or arrange for the handling, disposal, storage or transportation of: (a) any type of hazardous materials, dangerous goods, or Goods containing hazardous materials or dangerous goods, or (b) any type of Goods, which may be regulated by a governmental body, entity or agency, including but not limited to those Goods, which are regulated by the United States Food and Drug Administration, the United States Department of Agriculture, the United States Drug Enforcement Administration, the United States Bureau of Alcohol, Tobacco, Firearms and Explosives, and analogous regulatory agencies in countries in which the Services are provided (collectively, "Hazardous, Dangerous or Regulated Goods"). CUSTOMER warrants and covenants that it will not itself or through others offer, present or otherwise tender any Hazardous, Dangerous or Regulated Goods to TRANS-TRADE, its affiliates, assignees, agents or subcontractors under this Agreement. Notwithstanding the foregoing, TRANS-TRADE may take any action that TRANS-TRADE, in its sole discretion, deems appropriate or necessary in relation to any actual or suspected Hazardous, Dangerous or Regulated Goods. CUSTOMER hereby fully and completely releases and forever discharges and indemnifies TRANS-TRADE and its customers against all Claims arising out of or caused by actual or suspected Hazardous, Dangerous or Regulated Goods. CUSTOMER shall indemnify, defend, and hold harmless TRANS-TRADE and its Customers from and against all Claims related to or arising out of any TRANS-TRADE action taken in relation to such actual or suspected Hazardous, Dangerous or Regulated Goods, CUSTOMER's noncompliance with applicable laws and regulations, or the breach of any covenant of CUSTOMER contained in or made pursuant to this Section.

## 18. Dispute Resolution Process

The Parties agree to utilize the dispute resolution process to resolve any disputes, claim or question between them with respect to this Agreement ("Dispute") as expeditiously as possible. The Parties shall keep confidential, except as may be required by law, all aspects of the Dispute and the Dispute resolution process. One Party shall give written notice to the other Party of the Dispute and request commencement of the Dispute resolution process. Then, the project managers from each Party shall meet within fifteen (15) business days to negotiate and use commercially reasonable efforts to promptly reach a resolution of the Dispute. If the Dispute is not resolved by the project managers within such fifteen (15) day period, either Party may give notice to the other Party that the Dispute must be escalated to the senior officers of each Party, who will meet within fifteen (15) business days to negotiate and use commercially reasonable efforts to resolve the Dispute. In the event the senior officers are unable to resolve the Dispute within sixty (60) days (unless the Parties mutually agree to extend their discussions) either Party may pursue any remedies that may be available at law or in equity.

## 19. Warranties

ANY WARRANTIES OF THE PARTIES EXPRESSLY SET FORTH IN THIS AGREEMENT ARE THE SOLE WARRANTIES MADE BY THE PARTIES AND ARE IN LIEU OF ALL OTHER WARRANTIES, EXPRESS, IMPLIED, OR STATUTORY, INCLUDING BUT NOT LIMITED TO IMPLIED WARRANTIES OF MERCHANTABILITY, OF TITLE OR NONINFRINGEMENT, OF FITNESS FOR A PARTICULAR PURPOSE, OR ARISING FROM COURSE OF PERFORMANCE, COURSE OF DEALING, OR USAGE OF TRADE. IN ANY JURISDICTION, WHICH DOES NOT ALLOW THE EXCLUSION OR LIMITATION OF IMPLIED WARRANTIES, ANY IMPLIED WARRANTIES, TO THE MAXIMUM EXTENT PERMITTED BY THE APPLICABLE LAWS OF ANY SUCH JURISDICTION, SHALL BE LIMITED TO THE TERM OF THIS AGREEMENT. EXCEPT TO THE EXTENT EXPRESSLY PROVIDED IN THE APPLICABLE SCHEDULE, CUSTOMER'S SOLE REMEDY FOR BREACH OF ANY SUCH WARRANTY SHALL BE LIMITED TO THE REPERFORMANCE OF THE SERVICE AT ISSUE.

## 20. Title to Goods

Title to Goods remains with CUSTOMER. Notwithstanding anything herein to the contrary, nothing in this Agreement may be deemed to waive or otherwise limit any lien rights that TRANS-TRADE may have under applicable law with respect to the Goods.

## 21. Lien Rights

Nothing in this Agreement or in any incorporated document shall be deemed to waive or otherwise limit any lien rights that TRANS-TRADE may have under applicable law with respect to the Goods.

Copyright ©2015 – Trans-Trade, Inc.
Commercial, Confidential & Proprietary Information
All document versions are controlled electronically. All paper copies will be considered uncontrolled.

DC#: ADMF000046
Version: 5.0
Effective Date: 7/29/2015

**Warehouse and Distribution Service Agreement**  Page 6

## 22. General Provisions

a. **Assignment; Third Party Beneficiaries.** The rights and obligations under this Agreement may not be transferred or assigned to a third party by either Party without the prior written consent of the other Party; provided however, TRANS-TRADE may transfer or assign all or part of its rights and/or obligations of this Agreement to one or more of its parent or affiliates. Under no circumstances may CUSTOMER resell any of the Services to any third party without the express written consent of TRANS-TRADE. There are no third party beneficiaries under this Agreement, except that TRANS-TRADE's affiliates that perform Services are third party beneficiaries of TRANS-TRADE's rights, remedies and benefits under this Agreement.

b. **Amendments; Waiver; Severability.** Except for any changes to the Fees by TRANS-TRADE pursuant to Section 8, this Agreement can only be modified or amended by a written instrument signed by the Parties. A waiver of any right by either Party will not constitute a waiver of such right on any subsequent occasion. Acceptance by TRANS-TRADE of the amounts (or lesser amounts) payable under this Agreement is not to be deemed a waiver of any default. If any provision of this Agreement is determined to be invalid, such invalidity will not affect the validity of the remaining portions of this Agreement.

c. **Survival.** Upon any expiration or termination of this Agreement for any reason, all rights and obligations of the parties under this Agreement shall cease except for (i) the rights and obligations of the parties under sections in this contract including but not limited to Sections 9, 11, 12, 13, 18, 19, 20, 21, 22 and 23, which shall survive for an unlimited period, and (ii) the rights and obligations of the parties under any other provision of this Agreement which, by its expressly stated terms, is intended to survive the termination of this Agreement for a specified period, in which case such provision shall survive such termination or expiration for such specified period.

d. **Controlling Law.** This Agreement is governed by the laws of the State of Texas without regard to conflicts of laws provisions.

e. **No Use of Trademarks.** Neither Party may use the other Party's or its affiliates' name, logo, trademarks, service marks or trade names without the other Party's prior written consent; provided however, TRANS-TRADE may disclose CUSTOMER's name as a reference to any current or prospective customer. CUSTOMER may disclose TRANS-TRADE's name as a reference to any current or prospective customer.

f. **Non-Solicitation of Personnel.** During the term of this Agreement and for two (2) years after its expiration or termination, neither Party may actively solicit the employment of any employee of the other Party, which employee was engaged in the performance of this Agreement. Notwithstanding the foregoing, neither Party may be precluded from conducting general recruiting activities, such as participating in job fairs or publishing advertisements for general circulation. If the soliciting Party violates this Section, then such Party shall pay to the other Party an amount equal to one (1) year's salary for any solicited employee as liquidated damages. The amount of annual salary will be the annual salary in effect at the date the employee was solicited. The Parties agree that such amount is a reasonable estimate of the damages to be suffered by the aggrieved Party in such an event, which damages would be difficult to ascertain, and that such amount is not intended to be a penalty.

g. **Intellectual Property Rights.** CUSTOMER and TRANS-TRADE acknowledge that the other has certain intellectual property rights that may be revealed or provided to the other Party in accordance with this Agreement. Each Party acknowledges that this Agreement does not grant any right or title of ownership in their respective intellectual property rights to the other unless specifically provided in this Agreement. Any intellectual property remains the originator's property unless otherwise provided herein.

h. **No Breach of Other Agreements.** CUSTOMER and TRANS-TRADE each respectively represent and warrant that its execution of this Agreement does not violate any applicable law or breach any other agreement to which it is a Party or is otherwise bound.

i. **Waiver of Subrogation.** CUSTOMER waives its rights of subrogation on behalf of its insurers for any loss or damage to Goods in excess of the liability limits set forth in Section 10.

j. **Notice.** Except where specifically provided otherwise, any notice required or permitted to be given is to be given in writing to the person and at the address listed below by personal delivery or certified mail, return receipt requested. The date of notice is as follows: the date upon which such notice is so personally delivered; or if by certified mail, the date of delivery.

| | |
|---|---|
| To: TRANS-TRADE, Inc. | To: Rooftop Brands (DBA) |
| Contracts and Compliance Department | Rooftop Group, USA, INC |
| P.O. Box 612369 | 8619 Wall ST, Suite 400 |
| 1040 Trade Ave., Ste. 106 | Austin, TX 78754 |
| DFW Airport, TX 75261 | Phone 1-416-720-4480 |

## 23. Entire Agreement

This Agreement sets forth the full and complete understanding of the Parties with respect to the matters herein and supersedes any and all agreements and representations between the Parties made or dated prior to the Effective Date, including any agreements regarding confidentiality.

Trans-Trade _____
Customer _____

Copyright ©2015 – Trans-Trade, Inc.
Commercial, Confidential & Proprietary Information
All document versions are controlled electronically. All paper copies will be considered uncontrolled.

DC#: ADMFO00046
Version: 5.0
Effective Date: 7/29/2015

IN WITNESS WHEREOF, the Parties hereto have caused this Schedule to be executed by their duly authorized representatives as of the Effective Date.

**TRANS-TRADE, INC.**                                    **Rooftop Group USA, INC.**

_____                             _____
Signature                                               Signature

_____                             _____
PATRICK WALSH                                           Phillip Lew
**Printed Name**                                        **Printed Name**

_____                             _____
DIRECTOR                                                Global Head of Customer Service
**Title**                                               **Title**

_____                             _____
4/18/17                                                 04/18/2017
**Date**                                                **Date**

Copyright ©2015 – Trans-Trade, Inc.
Commercial, Confidential & Proprietary Information
All document versions are controlled electronically. All paper copies will be considered uncontrolled.

DC#: ADMFO00046
Version: 5.0
Effective Date: 7/29/2015

# Schedule A

### Fees

| Service Fees | | |
|---|---|---|
| **Container Devan Services** | | |
| Drayage services – Seattle T-18 to Fife | $230.00 | + FSC +Chassis + Bobtail Wait time after 1 hour $75.00 per hour |
| Unload containers by carton, scan and apply pallet ID along with put away into location. | $250.00 | 40' Ocean Container |
| | $200.00 | LCL |
| | | |
| **Storage** | | |
| Pallet Storage in racked/bulk environment receipt and recurring storage | $7.25 | Per Pallet |
| **Outbound Order Handling Services** | | |
| Picking orders | $5.75 | Per Pallet |
| Pallet and stretch wrap | $10.25 | Per Pallet |
| Carton Labeling (materials & labor) | $0.20 | Per Label |
| Work order fee/BOL – FTL/LTL | $7.50 | Per Order |
| Small Pack Order fee | $2.75 | Per Order |
| | | |
| **Other Services (Upon Request and approved by customer)** | | |
| Seal (if required) | $5.00 | Per container/trailer |
| Shipping Supplies | 16% | Cost x 1.16 |
| Project Labor (customer requested) | TBD | Per project |
| General Warehouse Labor | $29.50 | Per Hour |
| Supervisor Labor | $42.00 | Per Hour |
| Overtime Rate | 150% | Per Hour |
| Weekend/Holiday Rate | 200% | Per Hour |

Trans-Trade _____
Customer _____

Copyright ©2015 – Trans-Trade, Inc.
Commercial, Confidential & Proprietary Information
All document versions are controlled electronically. All paper copies will be considered uncontrolled.

DC#: ADMFO00046
Version: 5.0
Effective Date: 7/29/2015

# Schedule B

## Scope of Services & Assumptions

### Inbound Profile:

Total Cntrs: 61*40HQ

All Floor Loaded

Total Cartons: 77,447 ctns

Carton Weight: 17.63lbs per carton

Carton Dim: 19*10*16 inches

Warehouse palletization requiremet:

1) Pallet Size: L48*W40*H50 inches

2) Pallet Qty: 24ctns per pallet

3) Pallet Storage: Double Stack

4) Single item palletized, no mix SKU allowed

Remark:

We have 3 different version products, each version has 3 different SKU ITEM, each SKU ITEM were single loaded, no mix. We can send you cntr details once we start working, you can see what version and what SKU in every container.

Breakdown details as below:

| ITEM VERSION | ITEM NAME | ITEM SKU | CNTR QTY | TTL CARTONS | WEIGHT OF EACH CARTON | DIM OF EAC |
|---|---|---|---|---|---|---|
| GLOBAL | X-WING | SW-1977 | 5 | 6311 | 17.63 LBS | 19x10x16 |
| | TIE-ADVANCED | SW-0327 | 6 | 7640 | 17.63 LBS | 19x10x16 |
| | SPEED BIKE | SW-1983 | 4 | 4837 | 17.63 LBS | 19x10x16 |
| REGULAR | X-WING | SW-1977 | 27 | 34732 | 17.63 LBS | 19x10x16 |
| | TIE-ADVANCED | SW-0327 | 13 | 16615 | 17.63 LBS | 19x10x16 |
| | SPEED BIKE | SW-1983 | 2 | 2192 | 17.63 LBS | 19x10x16 |
| INTERNET | SPEED BIKE | SW-1983 | 4 | 5120 | 17.63 LBS | 19x10x16 |
| TOTAL | | | 61 | 77447 | | |

Copyright ©2015 – Trans-Trade, Inc.
Commercial, Confidential & Proprietary Information
All document versions are controlled electronically. All paper copies will be considered uncontrolled.

DC#: ADMFO00046
Version: 5.0
Effective Date: 7/29/2015

**Inbound Services:**

Receive by container with single SKU, palletize noting any OS&D and putaway by location into Cargowise. Provide Visibility and reporting to customer.

**Outbound Profile:**

Outbound Orders sent by Propel to Transtrade, INC. by Electronic format EDI, Flatfile, XML and populated into Cargowise.

Inventory is managed at carton level.

Orders will be processed within 24 hours.

Customers are all retail.

Picking will be scanned at the carton level then palletized and stretch wrapped for outbound when required. Additional scan will be done at point of shipping outbound to loading status.

Outbound FTL/LTL/Small pack Carriers will be routed by Customer.

Drivers check in at Front desk and given a door number to load from.

Trans-Trade will load trailers for outbound orders between the hours of 8am-6pm PST.

Once loading is complete, driver signs BOL for outbound shipment and documents are finalized in Cargowise.

Agreed upon reporting and real time customer view through Trans-Trax

Copyright ©2015 – Trans-Trade, Inc.
Commercial, Confidential & Proprietary Information
All document versions are controlled electronically. All paper copies will be considered uncontrolled.

DC#: ADMFC00046
Version: 5.0
Effective Date: 7/29/2015




# Customer Financial Profile
## and
## Service Terms

30 —ฟ

| PLEASE NOTE: Trans-Trade's standard credit terms are NET 30 Days. |

**Revision Date: October 2, 2014**

Corporate Headquarters
1040 Trade Avenue, Suite 106
PO Box 612369
DFW Airport, TX 75261

Copyright 2014—Trans-Trade, Inc.
Commercial, Confidential & Proprietary Information
All document versions are controlled electronically. All paper copies will be considered uncontrolled.

DO#: ADM FO80001
Version: 2.0
Effective Date: 10/2/14

EXHIBIT
C

Customer Financial Profile

## Customer Financial Profile

| Client Business Name | ROOFTOP GROUP USA INC. | | | |
|---|---|---|---|---|
| Trade Names (DBA) | ROOFTOP BRANDS | | | |
| Business Street | 8619 WALL ST, SUITE 400 | | | |
| Business Street | | | | |
| Business City | AUSTIN | | Business State | TX |
| Postal Code | 78754 | Business Country | USA | |
| # Years in Business | 10 | | | |
| IRS or Social Security | 30-0468810 | DUNS # | 01-713-1134 | |
| Primary Contact Person | ANITA YORK | Title | DIRECTOR OF FINANCE | |
| Contact Telephone # | 416 720 4480 | FAX # | 949 271 3614 | |
| Contact Email Address | anita@rooftopbrands.com | | | |

| Corporate President | Darren Matloff |
|---|---|
| Corporate Secretary | |
| Corporate Treasurer | |

| A/P Contact & Title | Anita York | | | |
|---|---|---|---|---|
| A/P Email | anita@rooftopbrands.com | | | |
| A/P Contact Telephone | 416 720 4480 | FAX # | 949 271 3614 | |

| Bank of Reference | J.P. Morgan Chase Bank N.A. | | | |
|---|---|---|---|---|
| Bank Street Address | 12450 Greenspoint Drive, Suite 100, | | | |
| Bank City | Houston | | Bank State | TX |
| Postal Code | 77060 | Bank Country | USA | |
| Account # | 470952495 | | | |
| Bank Contact Person | Khadim  M. Kandji | Title | Relationship Manager | |
| Contact Telephone # | 281 875 9202 | FAX # | | |
| Email Address | Khadim.M.Kandji@Chase.com | | | |

| Credit Reference Name #1 | James Swinkin: Envy Media Group  360 Bayport Ave, | | |
|---|---|---|---|
| City, State, Postal Code | Bayport, New York 11705 | | |
| Contact Telephone # | 631 472 4246 | FAX # | |

| Credit Reference Name #2 | Ricky Pamani: Fortune 8 Sales & Marketing Inc. 333 S. Van Brunt St, | | |
|---|---|---|---|
| City, State, Postal Code | Englewood, NJ 07631 | | |
| Contact Telephone # | 201 510 0116 ext 101 | FAX # | 201 510 0117 |

| Credit Reference Name #3 | | | |
|---|---|---|---|
| City, State, Postal Code | | | |
| Contact Telephone # | | FAX # | |

| Internal Use Only | Name | Email | Phone # |
|---|---|---|---|
| Sales Account Executive: | | | |

PLEASE NOTE: Trans-Trade's standard credit terms are NET 10 Days

Copyright  2014 – Trans-Trade, Inc.
Commercial, Confidential & Proprietary Information
All document versions are controlled electronically. All paper copies will be considered uncontrolled.

DC#: ADMFC00001
Version: 2.0
Effective Date: 10/2/14

# TERMS AND CONDITIONS OF SERVICE

## (Please Read Carefully)

All Shipments to or from the Customer, which term shall include the exporter, importer, warehouse, sender, receiver, owner, consignor, consignee, transfer or transferee of the shipments will be handled by (herein call the "Company") on the following terms and conditions:

1. **Services by Third Parties.** Unless the Company carriers, stores or otherwise physically handles the shipment, and loss, damage, expense or delay occurs during such activity, the Company assumes no liability as a carrier and is not held responsible for any loss, damage, expense or delay to the goods to be forwarded or imported except as provided in paragraph 8 and subject to the limitations of paragraph 9 below, but undertakes only to use reasonable care in the selection of carriers, truckmen, lightermen, forwarders, customs brokers, agents, warehousemen and others to whom it may entrust the goods for transportation, cartage, handling and/or delivery and/or storage or otherwise. When the company carries, stores or otherwise physically handles the shipment, it does so subject to the limitation of liability set forth in paragraph 8 below unless a separate bill of lading, air waybill or other contract of carriage is issued by the Company, in which event the terms thereof shall govern.

2. **Liability Limitations of Third Parties.** The Company is authorized to select and engage carriers, truckmen, lightermen, forwarders, customs brokers, agents, warehouse and others, as required to transport, store, deal with and deliver the goods, all of whom shall be considered as the agents for the Customer, and the goods may be entrusted to such agencies subject to all conditions as to limitation of liability for loss, damage, expense or delay and to all rules, regulations, requirements and conditions, whether printed, written or stamped, appearing in bills of lading, receipts or tariffs issued by such carriers, truckmen, lightermen, forwarders, customs brokers, agents, warehousemen and others. Except for cases of gross negligence or intentional misconduct, the Company shall under no circumstances be liable for any loss, damage, expense or delay to the goods for any reason whatsoever when said goods are in custody, possession or control of third parties selected by the Company to forward, enter and clear, transport or render other services with respect to such goods.

3. **Choosing Routes or Agents.** Unless express instructions in writing are received from the Customer, the Company has complete freedom in choosing the means, route and procedure to be followed in the handling, transportation and delivery of the goods. Advice by the Company to the Customer that a particular person or firm has been selected to render services with respect to the goods shall not be construed to mean that the Company warrants or represents that such person or firm will render such services.

4. **Quotations Not Binding.** Quotations as to fees, rates of duty, freight charges, insurance premiums or other charges given by the Company to the Customer are for informational purposes only and are subject to change up to ten percent (10%) of the quotation without notice and shall not under any circumstances be binding upon the Company unless the Company in writing specifically undertakes the handling or transportation of the shipment at a specific rate.

5. **Duty to Furnish Information.**

   a. Customer acknowledges that it is required to review all documents and declarations prepared and/or filed with U.S. Customs & Border Protection, other Government Agency and/or third parties, and will immediately advise Company of errors, discrepancies, incorrect statements, or omissions on any declaration or other submission filed on Customer's behalf.

   b. On an import at a reasonable time to entering of the goods for US Customs, the Customer shall furnish to the Company invoices in proper form and other documents necessary or useful in the preparation of the US Customs entry and security filing and, also, such further information as may be sufficient to establish, inter alia, the dutiable value, the classification, the country of origin, the genuineness of the merchandise and any mark or symbol associated with it, the Customer's right to import and/or distribute the merchandise, and the merchandise's admissibility, pursuant to US law or regulation. If the Customer fails in a timely manner to furnish such information or documents, in whole or part, as may be required to complete US Customs entry or comply with US laws or regulations, or if the information or documents furnished are inaccurate or incomplete, the Company shall be obligated only to use its best judgment in connection with the shipment and in no instance shall be charged with knowledge by the Customer of the true circumstances to which such inaccurate, incomplete, or omitted information or documentation pertains. Where a bond is required by US Customs to be given for production of any document or the performance of an act, the Customer shall be deemed bound by the terms of the bond notwithstanding the fact that the bond has been executed by the Company as principal, it being understood that the Company entered into such undertaking at the instance and on behalf of the Customer, and the Customer shall indemnify and hold the Company harmless for the consequences of any breach of the terms of the bond by the Customer.

   c. On an export at a reasonable time prior to the exportation of the shipment the Customer shall furnish to the Company the commercial invoice in proper form and number, a proper consular declaration, weights, measures, values and other information in the language of and as may be required by the laws and regulations of the US and the country of destination of the goods.

   d. On export or import the Company shall not in any way be responsible or liable for increased duty, penalty, fine or expense unless caused by the negligence or other fault of the Company, in which event its liability to the Customer shall be governed by the provisions of paragraphs 8 – 10 below. The Customer shall be bound by and warrant the accuracy of all invoices, documents and information furnished to the Company by the Customer or its agent for export, entry, or other purposes and the Customer agrees to indemnify and hold harmless the Company against any increased duty, penalty, fine, or expense including reasonable attorney's fees, resulting from any inaccuracy, incomplete statement, omission or any failure to make timely presentation, even if not due to an negligence of the Customer.

PLEASE NOTE: Trans-Trade's standard credit terms are NET 10 Days.

Copyright 2014 – Trans-Trade, Inc.
Commercial, Confidential & Proprietary Information
All document versions are controlled electronically. All paper copies will be considered uncontrolled.

DC#: ADMFO00001
Version: 2.0
Effective Date: 10/2/14

6. **Declaring Higher Valuation.**  Inasmuch as truckers, carriers, warehousemen, and others to whom the goods are entrusted usually limit their liability for loss or damage unless a higher value is declared and a charge based on such higher value is agreed to by said truckers, etc., the Company must receive specific written instructions from the Customer to pay such higher charge based on valuation and the trucker, etc., must accept such higher declared value; otherwise the valuation placed by the Customer on the goods shall be considered solely for export or customs purposes and the goods will be delivered to the truckers, etc. subject to the limitation of liability set forth herein in paragraphs 8 – 10 below with respect to any claim against the Company and subject to the provisions of paragraph 2 above.

7. **Insurance.**  The Company will make reasonable efforts to effect marine, fire, theft and other insurance upon the goods only after specific written instructions have been received by the Company in sufficient time prior to shipment from point of origin, and the Customer at the same time states specifically the kind and amount of insurance can or will be placed. Unless the Customer has its own open marine policy and instructs the Company to effect insurance under such policy, insurance is to be effected with one or more insurance companies or other underwriters to be selected by the Company. Any insurance placed shall be governed by the certificate or policy issued and will only be effective when accepted by such insurance companies or underwriters. Should an insurer dispute its liability for any reason, the insured shall have recourse against the insurer only and the Company shall not be under any responsibility or liability in relation thereto, notwithstanding that the premium upon the policy may not be at the same rates as that charged or paid to the Company by the Customer, or that the shipment was insured under a policy in the name of the Company. Insurance premiums and the charge of the Company for arranging the same shall be at the Customer's expense. If for any reason the goods are held in warehouse, or elsewhere, the same will not be covered by any insurance, unless the Company receives written instructions from the Customer. Unless specifically agreed in writing, the Company assumes no responsibility to effect insurance on any export or import shipment, which it does not handle.

8. **Limitation of Liability for Loss, etc.**
   a. The Customer agrees that the Company shall only be liable for any loss, damage expense or delay to the goods resulting from the negligence or other fault of the Company; that, except for cases involving the Company's gross negligence or intentional misconduct, such liability shall be limited to an amount equal to the lesser of fifty dollars ($50,00) per entry or shipment or the fee(s) charged  for services, provided that, in the case of partial loss, such amount will be adjusted, pro rata.
   b. Where the Company issues its own bill of lading and receives freight charges as its compensation, Customer has the option of paying a special compensation and increasing the limit of Company's liability up to the shipment's actual value; however, such option must be exercised by written agreement, entered into prior to any covered transaction(s), setting forth the limit of the Company's liability and the compensation received.
   c. In instances other than in (b) above, unless the Customer makes specific written arrangements with the Company to pay special compensation and declare a higher value and Company agrees in writing, liability is limited to the amount set forth in (a) above.
   d. Except for cases involving the Company's intentional misconduct, Customer agrees that the Company shall, in no event, be liable for consequential, punitive, statutory or special damages in excess of the monetary limit provided for above.

9. **Presenting Claims.**  Company shall not be liable under paragraph 8 for any claims not presented to it in writing within 120 days of either the date of loss or incident giving rise to the claim; no suit to recover for any claim or demand hereunder shall be maintained against the Company unless instituted within one (1) year after the presentation of the said claim or such longer period provided for under statute(s) of State having jurisdiction of the matter.

10. **Advancing Money.**  The Company shall not be obliged to incur any expense, guarantee payment or advance any money in connection with the importing, forwarding, transporting, insuring, storing or coopering of goods, unless the same is previously provided to the Company by the Customer on demand. The Company shall be under no obligation to advance freight charges, customs duties or taxes on any shipment, nor shall any advance by the Company be construed as a waiver of the provisions hereof. *All advancement of funds by the Company will be subject to a disbursement fee of $15 or 2% of the disbursement amount, whichever is greater.*

11. **Compensation of Company.**  The compensation of the Company for it services shall be included with and is in addition to the rates and charges of all carriers and other agencies selected by the Company to transport and deal with the goods and such compensation shall be exclusive of any brokerage, commissions, dividends or other revenue received by the Company from carriers, insurers and others in connection with the shipment. On ocean exports, upon request, the Company shall provide a detailed breakout of the components of all charges assessed and a true copy of each pertinent document relating to these charges. In any referral for collection or action against the Customer for monies due the Company, upon recovery by the Company, the Customer shall pay the expenses of collection and/or litigation, including reasonable attorneys' fees.

12. **Repayment Terms.**  In consideration for the Company performing services on behalf of the Customer, including any advancement of funds, *Customer agrees to pay for the Company's services or advancing funds within 10 days of invoice date unless Customer has established other terms.*
   a. Banking Information: Trans-Trade, Inc. Remittance Lockbox: PO BOX 671013, Dallas, TX 75267-1013
      i.  Comerica Bank – Texas
          8828 Stemmons Frwy.
          Dallas, Texas 75247
          Acct#:   1881647976
          Routing#: 111000753
          Swift#:   MNBDUS33
          Address:  1040 Trade Ave., Suite 106 DFW Airport, TX 75261
      ii. All Remittance Detail must be sent to ar@transtrade.com (Payee is responsible for all transaction fees)

13. **Indemnification for Freight, Duties.**  In the event that a carrier, other person or any governmental agency makes a claim or

Copyright  2014 – Trans-Trade, Inc.
Commercial, Confidential & Proprietary Information
All document versions are controlled electronically. All paper copies will be considered uncontrolled.

DOI: ADMFO09001
Version: 2.0
Effective Date: 10/2/14

PLEASE NOTE: Trans-Trade's standard credit terms are NET 10 Days.

30 *[handwritten initials]*

**Terms and Conditions of Service**                                                                 **Page 5**

institutes legal action against the Company for ocean or other freight, duties, fines, liquidated damages or other money due arising from a shipment of goods of the Customer, except for cases involving the Company's gross negligence or intentional misconduct, the Customer agrees to indemnify and hold harmless the Company for any amount the Company may be required to pay such carrier, other person or governmental agency together with reasonable expenses, including reasonable attorney's fees, incurred by the Company in connection with defending such claim or legal action and obtaining reimbursement from the Customer. The confiscation or detention of goods by any governmental authority shall not affect or diminish the liability of the Customer to the Company to pay all charges or other money due promptly on demand.

14. **General Lien on Any Property.** The Company shall have a general lien on any and all property (and documents relating thereto) of the Customer, in its possession, custody or control or en route, for claims for charges, expenses or advances incurred by the Company in connection with any shipments of the Customer and if such claim remains unsatisfied for thirty (30) days after demand for its payment is made, the Company may sell at public auction or private sale, upon ten (10) days written notice, registered mail (RRR), to the Customer, the goods, wares and/or merchandise, or so much thereof as may be necessary to satisfy such lien and apply the net proceeds of such sale to the payment of the amount due to the Company. Any surplus from such sale shall be transmitted to the Customer, and the Customer shall be liable for any deficiency in the sale.

15. **No Responsibility for Governmental Requirements.** It is the responsibility of the Customer to know and comply with the marking requirements of the US Customs Service, the regulations of the US Food and Drug Administration, and all other requirements, including regulations of Federal, State and/or local agencies pertaining to the merchandise. The Company shall not be responsible for action taken or fines or penalties assessed by any governmental agency against the shipment because of the failure of the Customer to comply with the law of the requirements or regulations of any governmental agency or with a notification issued to the Customer by any such agency.

16. **Indemnity Against Liability Arising from the Importation or Exportation of Merchandise.** The Customer agrees to indemnify and hold the Company harmless from any claims and/or liability arising from the importation or exportation of merchandise which violates any federal, state and / or other laws or regulations and further agrees to indemnify and hold the Company harmless against any and all liability, loss, damages, costs, claims and / or expenses, including but not to reasonable attorney's fees, which the Company may hereafter incur, suffer or be required to pay by reason of claims by any government agency or private party. In the event that any action, suit or proceeding is brought against the Company by any government agency or any private party, the Company shall give notice in writing to the Customer by mail at its address on file with the Company. Upon receipt of such notice, the Customer at its own expense shall defend against such action and take all steps as may be necessary or proper to prevent the obtaining of a judgment and/or order against the Company.

17. **Loss, Damage or Expense Due to Delay.** Unless the services to be performed by the Company on behalf of the Customer are delayed by reason of the negligence or other fault of the Company, the Company shall not be responsible for any loss, damage or expense incurred by the Customer because of such delay. In the event the Company is at fault, as aforesaid, its liability is limited in accordance with the provisions of paragraphs 8 – 9 above.

18. **Construction of Terms and Venue.** The forgoing terms and conditions shall be construed according to the laws of the State of Texas.

19. **Consent to Screen.** The Customer authorizes Trans-Trade and its agents to carry cargo in a manner consistent with the TSA authorized security program in accordance with 49 CFR parts 15-48. This Shipping Contract is not limited to any one shipment, or series of shipments, and is meant to authorize Trans-Trade and its agents to arrange any and/or all transportation for freight on behalf of the Customer. The Customer authorizes Consent to Screen, Search, or Inspect all cargo tendered by and for the Customer from the date of this notification forward.

**Approved and Accepted**                                     **Approved and Accepted**

Rooftop Group USA Inc.                                     Trans-Trade, Inc.

Client Company Name

_____ April 18th 2017                        _____ 4/18/17

Authorized Representative      Date                         Authorized Representative      Date

Anita York

Please print or type officer name

Director of Finance

Title

Copyright 2014 – Trans-Trade, Inc.
Commercial, Confidential & Proprietary information
All document versions are controlled electronically. All paper copies will be considered uncontrolled.

DC#: ADMFC00001
Version: 2.0
Effective Date: 10/2/14

PLEASE NOTE: Trans-Trade's standard credit terms are NET 10 Days.

30

# ROOFTOP GROUP USA, INC.

### Secured Promissory Note

$587,181.33                                                                               May 29, 2019

Rooftop Group USA, Inc. (the "**Company**"), promises to pay to the order of the TriCon Logistics LLC (together with any permitted assignee, donee, successor or transferee thereof, the "**Holder**"), at such address as the Holder of this Note may designate in writing to the Company, or its permitted assigns, the original principal sum of $587,181.33 (the "**Principal Amount**") as provided in this Secured Promissory Note (this "**Note**"). In addition, any amounts properly invoiced by Holder to the Company pursuant to that certain Service Agreement for Fulfillment Distribution Services by and between Holder and the Company and dated as of May 29, 2019 (the "**Service Agreement**") shall be added to the Principal Amount hereunder.

All principal shall be paid in accordance with the payment schedule attached hereto as Exhibit A. Holder and the Company acknowledge and agree that Exhibit A includes the amounts estimated to be invoiced by Holder to the Company under the Service Agreement prior to the Maturity Date. To the extent that different amounts are properly invoiced by Holder to the Company under the Service Agreement, Holder may, in good faith, adjust Exhibit A to reflect such different amounts by providing written notice to the Company, and such adjusted Exhibit A shall control for purposes of this Note, subject to the Company's right, in good faith, to dispute the accuracy of any such invoice. Notwithstanding the foregoing, all amounts currently due and payable hereunder shall become due and payable on **September 15, 2019** (the "**Maturity Date**").

The Company may prepay this Note at any time without premium or penalty.

1.     **Default.**

1.1.     The entire unpaid balance of this Note shall, at the election of the Holder, be and become due and payable, upon the occurrence of any of the following events (each a "**Default Event**"), if the Company shall fail to cure such Default Event within thirty (30) days of receipt of written notice thereof from Holder:

1.1.1.     the Company fails to pay when due and payable (whether at the Maturity Date or otherwise) (i) the amount of any principal payment due and payable on this Note, (ii) the full amount of any other sum then accrued on or pursuant to this Note or (iii) any amount due and payable pursuant to the Service Agreement; or

1.1.2.     if the Company (i) applies for or consents to the appointment of, or if there shall be a taking of possession by, a receiver, custodian, trustee or liquidator for the Company or any of its property or commences any proceeding relating to the Company under any bankruptcy, reorganization, arrangement, insolvency, readjustment of debt, dissolution or liquidation law of any jurisdiction or any such petition or application is filed, or any such proceeding is commenced, against Company and either (a) Company indicates its written approval thereof, consent thereto or acquiescence therein or (b) such petition, application or proceeding is not dismissed, vacated or discharged, or stayed or bonded pending appeal, within ninety (90) days of its commencement; (ii) makes a general assignment for the benefit of creditors or becomes insolvent; or (iii) files, applies for or is served with any petition for relief under the Bankruptcy Code or any similar federal or state statute and such action or proceeding is not dismissed, vacated or discharged, or stayed or bonded pending appeal, within ninety (90) days of its commencement.

AmericasActive:13480804.1

EXHIBIT
D

Scanned with CamScanner

1.2      Each right, power or remedy of the Holder hereof upon the occurrence of any Default Event as provided for in this Note or now or hereafter existing at law or in equity or by statute shall be cumulative and concurrent and shall be in addition to every other right, power or remedy provided for in this Note, any other agreement between the Company and Holder (including, without limitation, the Service Agreement) or now or hereafter existing at law or in equity or by statute, and the exercise or beginning of the exercise by Holder or transferee hereof of any one or more of such rights, powers or remedies shall not preclude the simultaneous or later exercise by the Holder hereof of any or all such other rights, powers or remedies. Upon the Company's failure to cure a Default Event within the afore-referenced cure period, as set forth in paragraph 1.1 above, the Holder shall then have the immediate right, at the sole discretion of the Holder and without further notice, demand, presentment, notice of nonpayment or nonperformance, protest, notice of protest, notice of intent to accelerate, notice of acceleration, or any other notice or any other action (**ALL OF WHICH THE COMPANY HEREBY EXPRESSLY WAIVES AND RELINQUISHES**), (i) to declare the entire unpaid balance of the indebtedness evidenced by this Note (including, without limitation, the outstanding principal balance hereof, all sums advanced or accrued hereunder, and all accrued but unpaid interest thereon) at once immediately due and payable (and upon such declaration, the same shall be at once immediately due and payable) and may be collected forthwith, regardless of the stipulated date of maturity; (ii) to foreclose any liens and security interests securing payment hereof or thereof (including, without limitation, any liens and security interests covering any portion of the Collateral); and (iii) to exercise any of the Holder's other rights, powers, recourses and remedies pursuant hereto or the Services Agreement or at law or in equity. All rights and remedies of the Holder hereunder shall extend to any period after the initiation of foreclosure proceedings, judicial or otherwise, with respect to the Collateral or any portion thereof.

2.      **Failure to Act and Waiver.**  No failure or delay by the Holder hereof to insist upon the strict performance of any term of this Note or to exercise any right, power or remedy consequent upon a default hereunder shall constitute a waiver of any such term or of any such breach, or preclude the Holder hereof from exercising any such right, power or remedy at any later time or times. By accepting payment after the due date of any amount payable under this Note, the Holder hereof shall not be deemed to waive the right either to require payment when due of all other amounts payable under this Note, or to declare a default for failure to effect such payment of any such other amount. The failure of the Holder of this Note to give notice of any failure or breach of the Company under this Note shall not constitute a waiver of any right or remedy in respect of such continuing failure or breach or any subsequent failure or breach.

3.      **Transfer**.  This Note may not be transferred by the Holder without the prior written consent of the Company. In the event of any transfer, this Note shall be transferred on the books of the Company only by the registered Holder hereof or by its attorney duly authorized in writing or by delivery to the Company of a duly executed assignment. The Company shall be entitled to treat any Holder of record of this Note as the Holder in fact thereof and shall not be bound to recognize any equitable or other claim to or interest in this Note in the name of any other person, whether or not it shall have express or other notice thereof, save as expressly provided by the laws of Texas.

4.      **Notices.**  Any notice of communication shall be deemed given and received as of the date of such delivery or mailing, if addressed in accordance with this provision. All notices and communications under this Note shall be in writing and shall be either delivered in person or accompanied by a signed receipt therefore or mailed first-class United States certified mail, return receipt requested, postage prepaid, and addressed to the Company at the address listed on the signature page hereto, or the Holder at:

>       TriCon Logistics LLC
>       4450 W. Walnut Hill Ln., Suite 100
>       Irving, TX 75038
>       Attention: Chris Condon

AmericasActive:13480804.1

Scanned with CamScanner

Email: ccondon@tricon-logistics.com

with a copy (which shall not constitute notice) to:

Winston & Strawn LLP
2121 North Pearl Street, Suite 900
Dallas, Texas 75201
Attention: David Lange
Email: dlange@winston.com

5.      **GOVERNING LAW. THIS NOTE SHALL BE GOVERNED BY AND CONSTRUED AND ENFORCED IN ACCORDANCE WITH THE LAWS OF THE STATE OF TEXAS. THE PARTIES AGREE THAT ALL ACTIONS OR PROCEEDINGS ARISING IN CONNECTION WITH THIS NOTE SHALL BE TRIED AND LITIGATED ONLY IN THE STATE AND, TO THE EXTENT PERMITTED BY APPLICABLE LAW, FEDERAL COURTS LOCATED IN THE STATE OF TEXAS, COUNTY OF DALLAS. THE COMPANY AND THE HOLDER WAIVES, TO THE EXTENT PERMITTED UNDER APPLICABLE LAW, ANY RIGHT EACH MAY HAVE TO ASSERT THE DOCTRINE OF FORUM NON CONVENIENS OR TO OBJECT TO VENUE TO THE EXTENT ANY PROCEEDING IS BROUGHT IN ACCORDANCE WITH THIS SECTION.**

6.      **Cancellation.** After all principal at any time owed on this Note and any other expenses and obligations due under this Note have been paid in full, this Note shall be surrendered to the Company for cancellation and shall not be reissued.

7.      **Business Days.** If any payment is due, or any time period for giving notice or taking action expires, on a day which is a Saturday, Sunday or legal state holiday in Texas, the payment shall be due and payable on, and the time period shall automatically be extended to, the next business day immediately following such Saturday, Sunday or legal holiday.

8.      **Modification.** No modification or waiver of any provision of this Note shall be effective unless the same shall be in writing and signed by the Company and Holder, and then such waiver or consent shall be effective only in the specific instance to which it relates and for the purpose for which it is given.

9.      **Severability.** The invalidity, illegality or unenforceability of any provision of this Note shall not affect or impair the validity, legality or enforceability of the remainder of this Note.

10.     **Grant of Security Interest in the Collateral.** To secure the prompt payment and performance in full when due, whether by lapse of time, acceleration, mandatory prepayment or otherwise, of this Note, the Company, subject to any preexisting superior security interests in the Collateral (defined herein) hereby grants, pledges and assigns to the Holder a continuing priority security interest in, and a right to set off against, any and all right, title and interest of the Company in and to any and all assets of the Company now or hereafter held by Holder at any facility owned or leased by Holder, whether pursuant to the Service Agreement or otherwise (the "**Collateral**"). The Company hereby authorizes Holder to file UCC financing statements in the appropriate filing office, and any appropriate amendments thereto, in conformance with the terms hereof. Notwithstanding anything to the contrary contained herein, it is understood and agreed that Holder shall have no right to foreclose on its security interest granted herein, or to refuse to ship or distribute the Company's products under any Service Agreement, unless, and until, a Default Event has occurred and remained uncured beyond its applicable cure period provided herein.

11.     **Release of Claims; Covenant Not to Sue.** To induce Holder to enter into this Note, the Company, for itself and on behalf of the Company's officers, managers, directors, subsidiaries,

Scanned with CamScanner

successors and assigns (collectively with the Company, "Releasors" and individually a "Releasor"), hereby releases, acquits and forever discharges each Releasee (as hereinafter defined) from any and all claims, demands, debts, liabilities, actions or causes of action of any kind (if any there be), whether absolute or contingent, due or to become due, disputed or undisputed, liquidated or unliquidated, at law or in equity, or known or unknown (collectively, "Claims") that any Releasor now has, ever had or hereafter may have against Holder in any capacity or any of Holder's officers, directors, employees, agents, attorneys, representatives, subsidiaries, affiliates and shareholders (collectively with Holder, the "Releasees") based on any actions, inactions, transactions, or circumstances that have occurred on or before the date of this Agreement and that relate in any way to (i) the Service Agreement, the amounts owed by the Company thereunder or the Collateral, or (ii) any aspect of the dealings or relationships between or among the Company, on the one hand, and Holder, on the other hand, arising prior to the date hereof. The provisions of this <u>Section 11</u> shall survive the termination of this Note and the payment of the obligations outstanding hereunder. The Company, for itself and on behalf of the Company's successors, assigns and other legal representatives, hereby unconditionally and irrevocably agrees that the Company will not sue any Releasee on the basis of any Claim released, remised and discharged pursuant to the foregoing provisions of this <u>Section 11</u>, and if the Company or the Company's successors or assigns violates the foregoing covenant, the Company, for itself and its successors and assigns, agrees to pay, in addition to such other damages as any Releasee may sustain as a result of such violation, all attorneys' fees and other costs incurred by any Releasee as a result of such violation.

12. **Acknowledgement.** The Company irrevocably acknowledges and agrees that (a) as of the date hereof, $587,181.33 is owed by the Company to Holder and (b) the Company has no rights of setoff or counterclaims against Holder with respect to such amount.

13. **Amendment to Service Agreement.** The Company and Holder hereby agree that, notwithstanding any term of the Service Agreement to the contrary, any and all future amounts invoiced under the Service Agreement (other than those added to the Principal Amount hereunder) shall be paid by the Company within thirty (30) days of delivery of a written invoice by Holder to the Company.

13. **General Provisions.** This Note and all provisions hereof shall be binding upon the parties and all persons/entities claiming under or through them, and shall inure to the benefit of Holder, together with its permitted successors and assigns, including each owner and holder from time to time of this Note. Unless otherwise noted herein or otherwise agreed by the parties, time is of the essence as to all dates set forth herein. If a Default Event occurs and the Note is placed in the hands of an attorney for collection, or suit is filed hereon, and Holder prevails in such suit, or proceeds are held in bankruptcy, probate, receivership, reorganization, arrangement or other judicial proceeding for the establishment or collection of any amount called for hereunder, or if any amount payable or to be payable hereunder is collected through any such proceeding, the Company agrees to pay to Holder all reasonable costs of collection, including, but not limited to, court costs and reasonable attorneys' fees.

[Signature page follows]

AmericasActive:13480804.1

Scanned with CamScanner

IN WITNESS WHEREOF, the Company has caused this Note to be duly executed.

ROOFTOP GROUP USA, INC., LLC

By:

Name:

Title:

Address:

Acknowledged and agreed:

TRICON LOGISTICS LLC

By:

Name: Chris Condon

Title: Chief Executive Officer

Scanned with CamScanner

## Exhibit A
### Payment Schedule

| Date | Description | Amount | Balance |
|---|---|---|---|
| 29-May | SOA | 587,181.33 | 587,181.33 |
| | | Intentionally Omitted | |
| 1-Jun | DST Invoice | +50,000 | 637,181.33 |
| | | Intentionally Omitted | |
| 14-Jun | Payment | -215,000.00 | 422,181.33 |
| 1-Jul | DST Invoice | +50,000.00 | 472,181.33 |
| 8-Jul | Payment | -225,000.00 | 247,181.33 |
| 1-Aug | DST Invoice | +50,000.00 | 297,181.33 |
| 15-Aug | Payment | -215,000.00 | 82,181.33 |
| 1-Sep | DST Invoice | +40,000.00 | 122,181.33 |
| 15-Sep | Payment | -122,181.33 | 0.00 |

Scanned with CamScanner

## UCC FINANCING STATEMENT
FOLLOW INSTRUCTIONS

Lien Solutions
Representation of filing

**This filing is Completed**
File Number : 197717350585
File Date  : 06/12/2019

| A. NAME & PHONE OF CONTACT AT FILER (optional) |
|---|
| Phone: (800) 331-3282 Fax: (818) 662-4141 |

| B. E-MAIL CONTACT AT FILER (optional) |
|---|
| CLS-CTLS_Glendale_Customer_Service@wolterskluwer.com |

C. SEND ACKNOWLEDGMENT TO: (Name and Address)       25101 - WINSTON &

Lien Solutions            70329506
P.O. Box 29071
Glendale, CA  91209-9071        CALI

File with: Secretary of State, CA

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

1. DEBTOR'S NAME: Provide only one Debtor name (1a or 1b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 1b, leave all of item 1 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 1a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| Rooftop Group USA, Inc. | | | |

| OR | 1b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
|---|---|---|---|---|
| | | | | |

| 1c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| 9101 Wall Street, Suite 1300 | Austin | TX | 78754 | USA |

2. DEBTOR'S NAME: Provide only one Debtor name (2a or 2b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 2b, leave all of item 2 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 2a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| | | | |

| OR | 2b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
|---|---|---|---|---|
| | | | | |

| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| | | | | |

3. SECURED PARTY'S NAME (or NAME of ASSIGNEE of ASSIGNOR SECURED PARTY): Provide only one Secured Party name (3a or 3b)

| 3a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| TriCon Logistics LLC | | | |

| OR | 3b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
|---|---|---|---|---|
| | | | | |

| 3c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| 4450 W. Walnut Hill Lane, Suite 100 | Irving | TX | 75038 | USA |

4. COLLATERAL: This financing statement covers the following collateral:
All assets of Debtor now or hereafter held by Secured Party at any facility owned or leased by Secured Party, whether pursuant to that certain Service Agreement for Fulfillment Distribution Services dated as of May 30, 2019, by and between Debtor and Secured Party or otherwise.

## EXHIBIT

## E

5. Check only if applicable and check only one box: Collateral is ☐ held in a Trust (see UCC1Ad, item 17 and Instructions) ☐ being administered by a Decedent's Personal Representative

6a. Check only if applicable and check only one box:
☐ Public-Finance Transaction ☐ Manufactured-Home Transaction ☐ A Debtor is a Transmitting Utility

6b. Check only if applicable and check only one box:
☐ Agricultural Lien ☐ Non-UCC Filing

7. ALTERNATIVE DESIGNATION (if applicable): ☐ Lessee/Lessor ☐ Consignee/Consignor ☐ Seller/Buyer ☐ Bailee/Bailor ☐ Licensee/Licensor

8. OPTIONAL FILER REFERENCE DATA:
70329506          CA-0-70329506-57231486

Prepared by Lien Solutions, P.O. Box 29071,
Glendale, CA 91209-9071 Tel (800) 331-3282

## NOTICE OF PRIVATE SALE OF
## <u>STORED GOODS UNDER TEXAS UNIFORM COMMERCIAL CODE</u>

To:    (a) **Rooftop Group USA, Inc.**, a California limited liability company ("**Debtor**"), 5218 Spruce Street, Bellaire, Texas 77401; and

     (b) The parties listed on <u>Exhibit A</u>.[1]

From:   **TriCon Logistics LLC**, a Texas limited liability company ("**Secured Party**"), c/o Secured Party's counsel: David Lange, Winston & Strawn LLP, 2121 N. Pearl Street, Suite 900, Dallas, Texas 75201 (Telephone 214-453-6436).

   **PLEASE TAKE NOTICE** that, pursuant to (i) Section 7.210(a) of the Texas Uniform Commercial Code (Tex. Bus. & Com. Code Section 7.210(a)), (ii) Section 9.610 of the Texas Uniform Commercial Code (Tex. Bus. & Com. Code Section 9.610), (iii) that certain Service Agreement for Fulfillment Distribution Services dated as of April 18, 2017, by and between Debtor and Secured Party, that certain Terms and Conditions of Service dated as of April 18, 2017, by and between Debtor and Secured Party, and that certain Service Agreement for Fulfillment Distribution Services dated as of June 14, 2019, executed on June 27, 2019, by and between Debtor and Secured Party (together with any other similar service agreements between Debtor and Secured Party, collectively, the "<u>Service Agreement</u>"), and (iv) that certain Secured Promissory Note dated as of May 29, 2019, executed by Debtor in favor of Secured Party (the "<u>Note</u>"), the Secured Party will sell or cause to be sold (the "<u>Sale</u>") all of the Debtor's right, title and interest in and to all of the assets described on <u>Exhibit B</u> (including certain related documents and records, collectively, the "<u>Assets</u>") at a private sale to be held on or after **Tuesday, August 20, 2019 at 1:00 p.m. (Dallas, Texas time)** (the "<u>Sale Date</u>") to satisfy the outstanding amounts described below. This Notice, provided more than ten (10) days prior to the date of disposition of the Assets, is the only prior notice that you will receive of such disposition.

   As of August 7, 2019, storage and related charges totaling $743,824.67 are presently due and owing by Debtor to Secured Party on account of certain warehouse and related logistics services provided by Secured Party in favor of Debtor pursuant to the Service Agreement or otherwise. The Assets also secure the outstanding indebtedness owing by Debtor pursuant to the Note.

   The Assets are presently held by Secured Party at its warehouses located at (a) 4450 W. Walnut Hill Lane, Suite 100, Irving, Texas 75038 and (b) 2511 70th Avenue East, Suite D, Fife, Washington 98424. The Secured Party is not purporting to sell any interest in any asset that is (i) not owned by the Debtor; or (ii) not subject to a lien in favor of the Secured Party.

---

[1] This Notice is intended to comply with the procedural requirements of the Texas Uniform Commercial Code (Tex. Bus. & Com. Code Sections 7.210 and 9.610). Nothing herein shall be deemed an admission that Secured Party is required under the Texas Uniform Commercial Code, or otherwise, to provide notification of disposition to the parties receiving this Notice.

EXHIBIT

F

**TERMS AND CONDITIONS OF SALE**:  On or after the Sale Date, the Assets will be sold in bulk or in lots (at the sole and absolute discretion of Secured Party) to one or more purchasers (as determined by Secured Party in its sole and absolute discretion) on an "AS IS, WHERE IS" basis, with all faults, without recourse, and without any express or implied representations or warranties whatsoever, including, without limitation, condition of title, value or quality of the Assets.  Secured Party reserves its right, on, after, or prior to the Sale Date, to withdraw all or a portion of the Assets from the Sale for any reason whatsoever, modify, waive or amend any terms or conditions of the Sale, continue the Sale Date with respect to any or all of the Assets, or impose any other terms or conditions on the Sale or to cancel the Sale.  Secured Party reserves its right (or that of its assignee or designee) to add the expenses of the Sale to amounts owed to Secured Party by Debtor under the Service Agreement and Note to determine the amount of any surplus to be shared with Debtor.  Secured Party reserves all of the rights accruing to it under the Service Agreement, the Note and applicable law or in equity.

The Debtor is entitled to an accounting of the unpaid indebtedness and charges secured by the Assets and may request such an accounting by contacting counsel to Secured Party, David Lange, Winston & Strawn LLP, 2121 N. Pearl Street, Suite 900, Dallas, Texas 75201 at 214-453-6436.  Other parties with questions regarding the Sale or this Notice may also contact counsel for Secured Party using this same contact information.

Dated: August 8, 2019.

## EXHIBIT A

### Other Addressees

*This Notice is intended to comply with the procedural requirements of the Texas Uniform Commercial Code (Tex. Bus. & Com. Code Sections 7.210 and 9.610). Nothing herein shall be deemed an admission that Secured Party is required under the Texas Uniform Commercial Code, or otherwise, to provide notification of disposition to the parties receiving this Notice.*

| **Via Federal Express Overnight Delivery:** | **Via USPS Priority Express:** |
|---|---|
| Rooftop Group USA, Inc.<br>9101 Wall Street, Suite 1300<br>Austin, Texas 78754<br>Attn: Darren Matloff | Corporation Service Company, as Representative<br>P.O. Box 2576<br>Springfield, IL 62708 |
| Rooftop Group USA, Inc.<br>8619 Wall Street, Suite 400<br>Austin, Texas 78754<br>Attn: Darren Matloff | |
| Star Funding, Inc.<br>237 West 37th Street, 5th Floor<br>New York, NY 10018 | |
| BEGALINE LTD<br>Vanterpool Plaza, 2nd Floor, Wickams<br>Cay I, Road Town<br>Tortola, British Virgin Islands | |

## **EXHIBIT B**

**List of Assets**

[See attached]

**Exhibit B**
**Drone Inventory**

| Item # | Description | Total Quantity | DFW Quantity | SEA Quantity |
|--------|-------------|----------------|--------------|--------------|
| H5-2405 | ATOM FPRMICRO DRONE | 278 | 278 | 0 |
| HS-1933 | AIR COMBAT - 2.4 GHZ MOTION CONTROLLED BATTLING HELICOPTER TITANIUM/RED | 410 | 410 | 0 |
| HS-1936 | AIR COMBAT - 2.4 GHZ MOTION CONTROLLED BATTLING HELICOPTER BLUE/GOLD | 300 | 300 | 0 |
| HS-1943 | NEUTRON | 930 | 930 | 0 |
| HS1953 | AIR COMBAT | 310 | 310 | 0 |
| HS-1953 | AIR COMBAT - 2.4 GHZ MOTION CONTROLLED BATTLING HELICOPTER | 171 | 171 | 0 |
| HS-1954 | ATOM 1.0 MICRO DRONE - INDOOR/OUTDOOR WIRELESS QUADROCOPTER | 216 | 216 | 0 |
| HS-1956 | SKY RAIDER - 2.4 GHZ INDOOR/OUTDOOR BATTLING QUADROCOPTER | 333 | 333 | 0 |
| HS-1957 | SKY RAIDER - 2.4 GHZ INDOOR/OUTDOOR BATTLING QUADROCOPTER | 40 | 40 | 0 |
| HS-1958 | SKY RAIDER - 2.4 GHZ INDOOR/OUTDOOR BATTLING QUADROCOPTER | 368 | 368 | 0 |
| HS-2405 | ATOM FPV MICRO DRONE - INDOOR/OUTDOOR WIRELESS QUADROCOPTER | 368 | 368 | 0 |
| HS-2409 | SKY MASTER + FPV - 2.4 GHZ BLUE QUADROCOPTER W/ LIVE VIDEO STREAMING | 34 | 34 | 0 |
| HS-2412 | ORBIT HD BLACK - 2.4 GHZ QUADROCOPTER W/ HD CAMERA | 249 | 249 | 0 |
| HS-2413 | ORBIT HD GREEN - 2.4 GHZ QUADROCOPTER W/ HD CAMERA | 187 | 187 | 0 |
| HS-2414 | ORBIT HD, 508936404 | 290 | 290 | 0 |
| HS-2416 | ORBIT HD RED - 2.4 GHZ QUADROCOPTER W/ HD CAMERA | 486 | 486 | 0 |
| HS-2418 | ORBIT HD - 2.4 GHZ QUADROPCOPTER W/ HD CAMERA | 45 | 45 | 0 |
| HS-2422 | PROTON MICRO DRONE - INDOOR/OUTDOOR WIRELESS QUADROCOPTER | 378 | 378 | 0 |
| HS-2425 | PROTON MICRO DRONE | 452 | 452 | 0 |
| HS-2432 | SKY FORCE | 170 | 170 | 0 |
| HS-2433 | SKY FORCE | 878 | 878 | 0 |
| HS-2436 | XS T WIFI | 24 | 24 | 0 |
| HS-2438 | PROPEL GROVITIONAND WIFI | 196 | 196 | 0 |

| | | | | |
|---|---|---|---|---|
| HS-2443 | GRAVITON+WIFI | 275 | 275 | 0 |
| HS-2445 | ZIPP NANO X2 | 505 | 505 | 0 |
| HS-2447 | ZIPP NANO X2 | 297 | 297 | 0 |
| HS-2448-B | ZIPP NANO X2 BLACK | 200 | 200 | 0 |
| HS-2448-R | ZIPP NANO X2 RED | 560 | 560 | 0 |
| HS-2450 | ZIPP NANO | 388 | 388 | 0 |
| HS-2452 | AIR COMBAT | 145 | 145 | 0 |
| NV-3820 | NAVIGATOR PACE MICRO DRONE | 7,682 | 0 | 7,682 |
| OD-2101 | ATOM MICRO DRONE RED | 8 | 0 | 8 |
| OD-2108 | PROPEL SKY FORCE 2 PACK BATTLING DRONES ASSORTMENT | 12 | 0 | 12 |
| OD-2111 | NEUTRON BLUE | 91 | 0 | 91 |
| OD-2113 | SKYRIDER BLUE + EXTRA BATTERY | 1,128 | 0 | 1,128 |
| OD-2114 | SKYRIDER RED + EXTRA BATTERY | 2,042 | 0 | 2,042 |
| PL-1350 | PL-1351/1352/1354/1355 PROPEL PROTON MICRO DRONE ASSORTMENT | 100 | 100 | 0 |
| PL-1390 | ATOM 1.0 MICRO DRONE | 1,880 | 1,880 | 0 |
| PL-1400 | SPYDER X - Palm sized high performance drone | 4,746 | 4,746 | 0 |
| PL-1402 | SPYDER STUNT DRONE-28MC/PLT | 5,050 | 5,050 | 0 |
| PL-1434 | CLOUD RIDER | 85 | 85 | 0 |
| PL-1483 | SPYDER X | 86 | 86 | 0 |
| PL-1486 | Propel RC Spyder X Stunt Drone, Champagne | 156 | 156 | 0 |
| PL-1530* | Propel Tilt Hybrid Stunt Drone + HD Camera+ Altitude Stability RED | 1,865 | 1,865 | 0 |
| PL-1530-SP | TILT COMPLETE SET (SPARE PART) | 47 | 47 | 0 |
| PL-1540 | SKY MASTER WHOLE SET | 33 | 0 | 33 |
| PL-1601 | | 20 | | 20 |
| PL-1720 | SKY RIDER FPV COMPLETE SET TITANIUM | 546 | 0 | 546 |

| PL-1763-R | TUNNEL PALM DRONE RED 7379565 | 32 | 0 | 32 |
|---|---|---|---|---|
| PL-1770 | MOVE (1318531) | 2 | 0 | 2 |
| PL-1771 | MOVE DRONE - GREEN | 292 | 0 | 292 |
| PL-1772 | MOVE DRONE - RED | 301 | 0 | 301 |
| PLM-472 | RC SNAKE (1128823) | 91 | 0 | 91 |
| QC-0950 | MULTI PACK MOTION CONTROL UFO BLUE AND DARK GREY | 5,712 | 5,712 | 0 |
| QC-0951 | ROCKET RC LEVICOPTER RED/SILVER | 5,694 | 5,694 | 0 |
| QC-0958 | AIR CRAWLER RED | 1,056 | 1,056 | 0 |
| QC-0959 | ROCKET RC AIR CRAWLER SILVER | 216 | 216 | 0 |
| SC-2053 | One Click | 60 | 60 | 0 |
| SL-1814 | VIDEO TALKER | 49 | 0 | 49 |
| SL-1815 | SL-1815 PDQ | 532 | 0 | 532 |
| SW-0327-CX | STAR WARSTIEFIGHTER DRONE | 1,629 | 1,619 | 10 |
| SW-1977-CX | STAR WARS BATTLING XWING DRONE | 1,561 | 1,550 | 11 |
| SW-1983-CX | STAR WARS SPEEDER BIKE DRONE | 2,215 | 2,208 | 7 |
| SW-1983CX-BD | SPEEDER BIKE BODY | 1,376 | 48 | 1,328 |
| SWD-111 | STAR WARS POS DISPLAY | 144 | 144 | 0 |
| TK-0530 | CST TANK | 408 | 408 | 0 |
| TK-0534 | TANKS | 1,359 | 1,359 | 0 |
| TK-0543 | TANKS | 1,608 | 1,608 | 0 |
| VL-3540 | MAXIMUM X03 STUNT DRONE | 15,054 | 0 | 15,054 |
| VL-3630 | MAXIMUM MOVE DRONE RED/BLACK | 20,945 | 0 | 20,945 |
| WB-4001 | BATMAN | 272 | 272 | 0 |
| WB-4002 | SUPERMAN | 13 | 8 | 5 |
| WB-4003 | MOTION CONTROL RC FLYING BATMAN/SUPERMAN | 1,582 | 1,582 | 0 |

| WB-4010 | BATWING MICRO DRONE | 7,491 | 520 | 6,971 |
|---|---|---|---|---|
| | **Grand Total** | **104,754** | **47,562** | **57,192** |

**From:** Lipkind, Alec <Alec.Lipkind@disney.com>
**Sent:** Saturday, August 17, 2019 1:56 PM
**To:** Lange, David M. <DLange@winston.com>
**Cc:** Schreiber, Carey D. <CSchreiber@winston.com>
**Subject:** RE: Potential Trademark Infringement Arising From Notice of Private Sale of Stored Goods Under Texas Uniform Commercial Code

**Via Email (DLange@winston.com)**
TriCon Logistics, LLC
c/o David Lange
Winston & Strawn LLP
2121 N. Pearl Street, Suite 900
Dallas, Texas 75201

> RE:    **Potential Trademark Infringement Arising From Notice of Private Sale of Stored Goods Under Texas Uniform Commercial Code**

Dear Mr. Lange:

Disney Consumer Products, Inc. ("Disney"), provides this notice to TriCon Logistics, LLC ("TriCon") of Disney's contractual and intellectual property rights in and to those items identified in the inventory of products having the designation "SW-___" ("Disney Trademarked Inventory") referenced in the recent Notice of Private Sale of Stored Goods Under Texas Uniform Commercial Code ("Sale Notice"). The Disney Trademarked Inventory exists pursuant to a license agreement between Rooftop Group International Pte. Ltd. ("Debtor") and Disney. Under the license agreement, Debtor was contractually obligated to make payments to Disney to maintain its license to incorporate Disney intellectual property into the products in the Disney Trademarked Inventory. Debtor breached the license agreement by, among other things, failing to pay Disney. Due to Debtor's breach of the license agreement, Disney terminated the license agreement on July 26, 2018, thereby ending any rights Debtor (and by extension Rooftop Group USA, Inc.[1]) had to incorporate, sell or distribute Disney intellectual property. Moreover, under the license agreement, Debtor was obligated to return or destroy the Disney Trademarked Inventory upon termination of the license agreement. Thus, the Disney Trademarked Inventory is contractually owned by Disney and it embodies Disney intellectual property that is not licensed by Disney for sale or distribution.

Disney recently received the Sale Notice, which indicates that TriCon, an alleged warehouse lienholder, intends to sell the Disney Trademarked Inventory to third parties. TriCon is now on formal notice that: (1) TriCon's sale of Disney property is in violation of Disney's contractual rights; and (2) the Disney Trademarked Inventory embodies Disney intellectual property that is unlicensed such that any sale or distribution constitutes trademark infringement and copyright infringement. Disney reserves all of its rights, including the right to seek injunctive relief, damages and attorney's fees.

Disney is further concerned that any markings or notices on the Disney Trademarked Inventory and that any representations that TriCon may make in connection with the Disney Trademarked Inventory in terms of whether Disney has authorized the sale and distribution of the products may be misleading or inaccurate.

**EXHIBIT G**

We trust that TriCon will respect the rights of Disney in and to the Disney Trademarked Inventory. Having now been on notice of Disney's rights, any violation thereof by TriCon could support a finding of willfulness, further enhancing the remedies available to Disney.

Should you or your client desire to discuss these issues, or their possible resolution, please feel free to contact me directly.

Very truly yours,

Alec M. Lipkind

cc: Carey D. Schreiber, Esq. (via email: CSchreiber@winston.com)

*This e-mail message is confidential, intended only for the named recipient(s) above and may contain information that is privileged, attorney work product or exempt from disclosure under applicable law. If you have received this message in error, or are not the named recipient(s), please immediately notify the sender at (212) 456-7176 and delete this e-mail message from your computer. Thank you.*

---

[1] Disney is still investigating how Rooftop Group USA, Inc., obtained possession of the Disney Trademarked Inventory. However, for avoidance of doubt, Disney hereby notifies you that neither Debtor nor Rooftop Group USA, Inc., has any license or authorization to possess, distribute, or sell the Disney Trademarked Inventory.



North America   Europe   Asia

2121 N. Pearl Street
Suite 900
Dallas, TX 75201
T +1 214 453 6500
F +1 214 453 6400

**BASHEER GHORAYEB**
Partner
214-453-6433
bghorayeb@winston.com

August 21, 2019

*By email (mdavis@lockelord.com)*
Matthew H. Davis
Locke Lorde LLP
2200 Ross Avenue Suite 2800
Dallas, Texas 75201

Re:     Rooftop USA

Dear Mr. Davis:

As you are aware, Winston & Strawn LLP represents TriCon Logistics LLC ("TriCon"). I write on behalf of TriCon in response to (1) your discussion with my law partner Carey Schreiber on August 15, 2019, and (2) the August 17, 2019 email from your client Alec Lipkind at Disney Consumer Products, Inc. ("DCP") to my law partners, Mr. Schreiber and David Lange.

As you are well aware, TriCon is a secured creditor of Rooftop USA, Inc. ("Rooftop USA") with a first priority, valid lien on certain collateral. You were previously provided with TriCon's Notice of Private Sale of Stored Goods Under Texas Uniform Commercial Code dated August 8, 2019 (the "UCC Sale Notice"). In connection with the UCC Sale Notice, TriCon is conducting a UCC private sale process pursuant to the Texas Uniform Commercial Code to liquidate its collateral (the "UCC Sale").

In short, DCP purports to provide TriCon with notice of DCP's "contractual and intellectual property rights in" in certain of TriCon's collateral that is the subject of the UCC Sale Notice. In particular, DCP asserts that it has a terminated license agreement with Rooftop Group International Pte. Ltd. (the "Debtor"), which is a debtor in a chapter 11 Case No. 19-31443-hdh11 pending in the United States Bankruptcy Court for the Northern District of Dallas (the "Bankruptcy Court"). Without explaining how, DCP asserts that its rights under the terminated agreement with the Debtor apply "by extension" to affect Rooftop USA's rights to its own inventory and the sale of TriCon's collateral, which is property of Rooftop USA and not property of the Debtor.

Despite Mr. Schreiber's request for relevant documentation, including any license agreement or related agreements and any notices sent under these agreements, DCP continues to provide us no basis from which to evaluate DCP's assertions. The only thing DCP's email makes clear is that DCP purports to have a contract with the Debtor, not with Rooftop USA. Indeed, DCP has provided no documentary support any of its allegations. It is thus unclear what, if any, contractual rights DCP is asserting.

EXHIBIT
H



August 21, 2019
Page 2

If you still contend that DCP has rights that would affect the UCC Sale, we reiterate our request that DCP produce (1) the license agreements with the Debtor (including all amendments), (2) any applicable standard terms and conditions, and (3) any notices provided in connection with the foregoing, including any notice of termination. Otherwise, TriCon will rely on DCP's continued withholding of such documents as an admission by DCP that there are no contracts supporting its claims.

TriCon is working independently of Rooftop USA and the Debtor, seeking to maximize the value of its collateral with an arm's length sale to an independent third-party buyer that will provide the highest bid. To be clear, TriCon is seeking to sell its collateral to reputable liquidators who are not affiliated with Rooftop USA or the Debtor. Nor will Rooftop USA or the Debtor obtain any of the proceeds from TriCon.

To maximize the collateral's value, TriCon must act now in anticipation of the upcoming holiday season. We note that it is in everyone's interest to allow the sale to proceed. If DCP's actions scare off buyers, it will impair the value of the assets being sold. In this regard, DCP is welcome to make an offer to purchase some or all of TriCon's collateral listed in the UCC Sale Notice.

TriCon reserves all of its rights, both at law and in equity.

Sincerely,

Basheer Ghorayeb

**From:** Britt McClung <Britt@hedrickkring.com>
**Sent:** Monday, August 19, 2019 5:55 PM
**To:** Lange, David M. <DLange@winston.com>; Schreiber, Carey D. <CSchreiber@winston.com>
**Cc:** Katie Clark <KClark@hedrickkring.com>; Laura Fontaine <Laura@hedrickkring.com>
**Subject:** TriCon Logistics/Rooftop USA - Notice of TRO

Counsel,

Attached is a copy of the temporary restraining order ("Order") issued today by the 101st Judicial District Court in Dallas, Texas, enjoining Rooftop USA from taking various actions that would affect Triumphant Gold Limited's rights as a creditor. As you will see, part of the Order enjoins a private sale of Rooftop USA's inventory that was previously noticed by your client TriCon Logistics, LLC, to be held on or after Tuesday, August 20, at 1:00 pm. We will deliver a courtesy copy of the Order to TriCon's Dallas location tomorrow, but I wanted to provide you notice as soon as I could. I called Mr. Schreiber's direct line but was not able to reach him; I am heading out of the office shortly, but I will call again tomorrow morning to discuss further.

Regards,

Britt McClung
**Hedrick Kring, PLLC**
1700 Pacific Avenue, Suite 4650 | Dallas, Texas 75201
Main: 214.880.9600 | Direct: 214.880.9663 | Fax 214.481.1844
Britt@HedrickKring.com | www.HedrickKring.com

**EXHIBIT**

**I**

CAUSE NO. DC-19-12093

| | | |
|---|---|---|
| TRIUMPHANT GOLD LIMITED. | § | IN THE DISTRICT COURT |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | 101st JUDICIAL DISTRICT |
| | § | |
| | § | |
| ROOFTOP GROUP SERVICES (US) INC. | § | |
| ROOFTOP GROUP USA, INC., | § | |
| | § | |
| Defendants. | § | DALLAS COUNTY, TEXAS |

### ORDER GRANTING PLAINTIFF'S APPLICATION FOR
### TEMPORARY RESTRAINING ORDER

On the _____ day of August 2019, the Court considered Plaintiff's Application for Temporary Restraining Order, Temporary Injunction, and Permanent Injunction (the "Application") filed by Plaintiff Triumphant Gold Limited ("TGL") seeking to restrain the actions of Defendants Rooftop Group Services (US) Inc. ("Rooftop Services") and Rooftop Group USA ("Rooftop USA") (collectively "Defendants"). After consideration of the Application and the evidence attached thereto, the Court is of the opinion that a temporary restraining order should be issued pursuant to Rule 680 of the Texas Rules of Civil Procedure.

### FINDINGS

From the evidence presented, the Court finds that by an agreement in writing dated July 25, 2016 made amongst TGL, Rooftop Services' parent company Rooftop Group International Pte Ltd. ("Rooftop Singapore"), and Darren Scott Matloff ("Matloff"), who was at all material times and remains the Chief Executive Officer and Director of Defendants, TGL agreed to make available to Rooftop Singapore a revolving loan facility in the amount of $10,000,000 (the "Loan Agreement"). The relevant loan in question, in the sum of $10,000,000, was extended from Plaintiff to Rooftop Singapore pursuant to an Amended Facility Agreement dated July 5, 2017.

Rooftop Singapore is the 100% owner of Rooftop Services, and Rooftop USA is 100% owned by Matloff, who also indirectly owns the majority interest in Rooftop Singapore via a self-settled trust of which he is the settlor, primary beneficiary, and investment director.

The Court further finds that on October 30, 2016, Rooftop USA entered into a Continuing Guaranty with TGL, and Rooftop Services entered into a Continuing Guaranty with TGL. The Continuing Guaranties are materially identical; both provide for a guaranty of all "present and future obligations and liabilities . . . of any of any Obligor [Rooftop Singapore] to the Lender [TGL] under the Finance Documents to which it is a party (including, without limitation all obligations and liabilities arising out of any extension, variation, modification, restatement or novation of such Finance Documents whatsoever)."

The Court further finds that on September 28, 2017, the Defendants and Rooftop Singapore entered into an Intercreditor Agreement ("ICA") with a group of their lenders, including TGL. The ICA provided that TGL would receive a second-lien security interest in purchase orders, accounts receivable, and credit balances of Rooftop USA (the "Collateral") to secure the Continuing Guaranties, subordinate to the senior lien of another lender, Star Funding. The UCC statements were filed on November 2, 2017, granting the liens to TGL. Star Funding has since been paid in full, and accordingly the TGL liens are now senior liens.

The Court further finds that Rooftop Singapore defaulted on the loans to TGL. Based on the representations of Defendant's principal Matloff that new money was coming into the business, TGL and Rooftop Singapore entered into an amended and restated side letter agreement, dated January 16, 2018, in which Rooftop Singapore was allowed to repay the outstanding amounts under the Amended Facility Agreement by February 12, 2018.

The Court further finds that Rooftop Singapore breached the Amended Facility Agreement (as modified in the amended side letter agreement) by failing to repay amounts when due. As of April 26, 2018, the total sum of $4,427,209.82 remained owing from Rooftop Singapore to Plaintiff. This figure was comprised of an outstanding original principal sum of $3,903,895.65 and accrued interest of $523,314.17. TGL took a judgment against Matloff on December 5, 2018, in the amount of $4,427,209.82.

The Court further finds that on April 30, 2019, Rooftop Singapore filed a voluntary bankruptcy petition in the United States Bankruptcy Court for the Northern District of Texas (the "Bankruptcy Court") under chapter 11 of the United States Bankruptcy Code. On June 19, 2019, Matloff filed an individual voluntary bankruptcy petition in the Bankruptcy Court. On August 6, 2019, the Bankruptcy Court confirmed that no automatic stay is in effect as to either Rooftop Services or Rooftop USA. Matloff has testified that he is liquidating Rooftop USA within the next thirty days.

The Court further finds that Defendants are insolvent under Texas Business and Commerce Code § 24.003(b), as the sum of their $4 million debts to TGL alone, not mention any other debt, "is greater than all of the debtor's assets at a fair valuation." As of June 28, 2019, Rooftop USA had only $2,366.16 in its Chase bank account. Rooftop USA also claims to have $385,426.07 in accounts receivable and no purchase orders. When asked whether Rooftop USA would be able to pay a debt allegedly owed to him, Matloff answered, "No." Rooftop Services has never had any inventory or assets at all and stopped operations in late 2017 or early 2018.

The Court further finds that Rooftop USA's bank statements show that it is being used largely to fund Mr. Matloff's lifestyle: in the last two weeks of June alone, *after* Mr. Matloff filed a no-asset bankruptcy in which he declared the value of Rooftop USA's stock at $20, Rooftop

**ORDER GRANTING PLAINTIFF'S APPLICATION FOR**
**TEMPORARY RESTRAINING ORDER** **PAGE 3**

USA paid more than $5,000 in airfare, meals, and transportation expenses for Mr. Matloff. Rooftop USA has paid for more than $25,000 of Matloff's travel, leisure, and living expenses in the last two months, even though Rooftop USA does not have ongoing business that would require it to fund Matloff's globe-trotting lifestyle. Rooftop USA has over $300,000 in receivables, and yet it is devoting its cash to paying creditors of other entities and Matloff's lifestyle. Matloff has testified that Rooftop Services was unable to pay its employees, and so he caused those employees to be paid by Rooftop USA instead.

The Court further finds that the bank account statements of the Defendants show that they have made many transfers in the past year for no consideration to entities with whom they have no contractual relationship. ICL is a subsidiary of Rooftop Singapore. Its accounts were frozen due to creditor actions in Singapore, and it was unable to make payments to certain creditors it wished to prefer. Therefore, Matloff has testified, he caused Rooftop USA to transfer money to Amax Industrial Group China Co., Ltd. ("AMAX"), a mainland China entity owned by a close friend of Matloff, and AMAX then paid the creditors of ICL with Rooftop USA's cash. This scheme used $418,000 of Rooftop USA's money in 2018 to pay ICL's debts via a foreign entity. Rooftop USA had no obligation to pay ICL's debts, and by using Rooftop USA's assets to pay another entity's debts, lenders of Rooftop USA such as TGL were harmed.

The Court further finds that this year, the bank account statements of Rooftop USA show that it has received millions in proceeds stemming from its accounts receivable and purchase orders. Specifically, Rooftop USA received payments totaling $1,065,007.69 from Wal-Mart Stores as proceeds from purchase orders and accounts receivable, and TGL had a secured interest in the purchase orders and accounts receivable giving rise to these payments. The purchase orders and accounts receivable of Rooftop USA in which TGL has a security interest include purchase

orders and accounts receivable from Wal-Mart Stores. TGL indisputably has a perfected interest in the original collateral through UCC financing statements, Exhibit D, and these specific identifiable amounts were received as proceeds from those perfected interests. Accordingly, as proceeds of TGL's perfected interest in purchase orders, accounts receivable, and credit balances, these amounts received from Wal-Mart constitute TGL's collateral.

The Court further finds that Matloff has caused Rooftop USA to make transfers for no consideration to foreign bank accounts, Matloff's relatives, and Matloff himself, even though Rooftop USA does not have any operations and is merely liquidating inventory. Matloff has flatly admitted that Rooftop USA has $385,426.07 in receivables as of July 26, 2019. He intends to direct one of those receivables to flow to Rooftop Services' bank account for the payment of Rooftop Services' taxes. Rooftop USA does not have any agreement with Rooftop Services that would require it to make this payment. This payment by Rooftop USA of one of Rooftop Services' alleged debts is without consideration to Rooftop USA.

The Court further finds that TriCon Logistics, LLC ("TriCon"), a warehouse company holding stored inventory of Rooftop USA in Dallas, Texas, noticed a private sale of said inventory to be held on Tuesday, August 20, 2019, to satisfy an alleged warehouse lien in the alleged amount of $743,824.67. The amount of the lien claimed by TriCon is extraordinary for the act of simply storing drones manufactured by Rooftop USA, particularly where Rooftop USA's bank statements reflect that it has already paid hundreds of thousands of dollars to Tricon that should have reduced any indebtedness. TriCon and Rooftop USA entered into an amended promissory note just weeks ago despite Rooftop USA's stated winding down, and now TriCon is already proceeding with foreclosure and sale. Rather than holding an auction to maximize the value of the inventory, TriCon has noticed a private sale to an unknown buyer. Rooftop USA's principal, Matloff, has a

history of organizing sales of distressed assets for the benefit of himself and his friends; in the Rooftop Singapore bankruptcy, the debtor proposed a sale of its only significant asset at a discount to a company that turned out to be owned by Matloff's longtime close friend.

The Court further finds that Rooftop USA made transfers to insiders, including Matloff himself, which allowed Matloff and Rooftop USA to maintain effective control over the property. These transfers were made out of the view of Rooftop USA's creditors at a time when TGL was already involved in a legal proceeding against Matloff himself as guarantor of the same debt described here, creating an obvious threat of suit against Defendants. These transfers removed assets from Rooftop USA, leaving it insolvent with approximately $2,000 in its account at the end of June 2019. These transfers were made around the time of the promissory note given to TriCon in May 2019, a substantial new debt obligation.

The Court further finds that, working in concert with TriCon, Rooftop USA seeks to transfer away its few remaining assets in a private sale to an unknown buyer just a few days' notice. Defendants are under threat of suit, as their principal and affiliates are already involved in litigation with creditors in the Bankruptcy Court. The transfer also appears to involve substantially all of the debtor's current assets aside from accounts receivable, and the debtor is insolvent. Rooftop USA has effectively transferred its assets to a lienor (TriCon) through a suspicious promissory note which its principal knows it could never have paid, and the lienor is now transferring the assets through private sale to an unknown party.

The Court further finds that TGL has a specific interest in the inventory because it was purchased using proceeds of TGL's loans to Rooftop Singapore, which used those proceeds to purchase inventory for Rooftop USA via its agent, Asian Express. Matloff testified that he caused TGL's loan proceeds to flow from Rooftop Singapore to Asian Express, which would then arrange

the manufacture of inventory in order to transfer it to Rooftop USA for sale in the United States. TGL therefore has an equitable interest in the inventory purchased with its money, in addition to its interest as a creditor in preventing all fraudulent transfers by the insolent Rooftop USA.

Based on the above, the Court finds that TGL is likely to succeed on the merits of its claims at the trial of this matter. The Court further finds that there exists a probable, irreparable, and imminent injury in the interim for which TGL does not have an adequate remedy at law. Defendants are unable to pay their debts as they come due, and therefore Defendants lack the ability to respond in money damages. Additionally, based on Defendants' transfers to other entities for no consideration, payment of Matloff's excessive lifestyle expenses, stated intent to wind down, and refusal to deliver the Collateral as demanded by TGL, it is probable that Defendants will take action to cause the transfer or disposal of TGL's Collateral and otherwise dissipate their remaining assets. Accordingly, if Defendants were able to proceed in violation of the Continuing Guaranties, TGL would suffer probable, irreparable, and imminent injury, and the Court will protect the Collateral. There is a likelihood that if Defendants were allowed to freely transfers assets and/or dispose of the inventory, it could cause the secured party immediate and irreparable harm as it may forever lose its security interest in those assets transferred or sold. The Court further finds that under the circumstances, it would be impracticable to give any further notice to the Defendants as TGL is currently suffering imminent and irreparable harm for which there is no adequate remedy at law.

The Court further finds that there is not sufficient time to serve further notice of this Application on the Defendants and hold a hearing. If Defendants were given further notice of this Application, they would likely secret the subject matter of this application thereby impairing the power of this Court to grant final relief. Additionally, because of the imminent and immediate

harm to TGL, it would be impracticable to require TGL to set this matter for hearing on any further notice.

## TEMPORARY RESTRAINING ORDER

It is therefore ORDERED that the Clerk of this Court shall issue a Temporary Restraining Order against Defendants and their agents, servants, employees, representatives, any entity in which they own a controlling interest, and all those acting in concert with them, IMMEDIATELY ENJOINING THEM FROM:

(a)  (i) secreting, destroying, hiding, encumbering, removing, selling, transferring, or conveying any of TGL's Collateral, including proceeds from accounts receivable or purchase orders in any bank account of Defendants including the Chase Bank Account ending in 2495, (ii) making transfers of any assets without receiving reasonable equivalent value approved by the Court, (iii) transferring funds out of Rooftop USA's account at Chase Bank ending in 2495, and (iv) disposing of Rooftop USA's inventory by private sale on August 20, 2019;

(b)  aiding anyone else in any of the activities prohibited by the Order Granting Plaintiff's Application for Temporary Restraining Order;

(c)  destroying or altering any documents, e-mails (including e-mails sent from personal e-mail accounts), electronic files, or other tangible evidence that may be relevant to this lawsuit.

This Order shall expire with further action on the part of the Court in fourteen (14) days. TGL's bond is set at $1,000.00. A law firm check is sufficient to post the bond. Upon the filing of the bond required herein, the Clerk of this Court shall issue a Temporary Restraining Order in conformity with the law and the terms of this Order Granting Plaintiff's Application for Temporary Restraining Order.

The hearing of the Application for Temporary Injunction is set for August 30, 2019, at 9:30 o'clock A.m. in the courtroom of Dallas County District Court 101st, located at George L. Allen, Sr. Courts Building, 600 Commerce Street, 6th Floor, Dallas, Texas, 75202.

Signed this 19 day of August, 2019, at 2:31 o'clock P.m.

_____

PRESIDING JUDGE

**Charles Stokes**
**Senior Judge**
**sitting by assignment**



North America   Europe   Asia

2121 N. Pearl Street
Suite 900
Dallas, TX 75201
T +1 214 453 6500
F +1 214 453 6400

**BASHEER GHORAYEB**
Partner
214-453-6433
bghorayeb@winston.com

August 20, 2019

*By email (britt@hedrickkring.com)*
Britt McClung
Hedrick Kring, PLLC
1700 Pacific Ave., Ste. 4650
Dallas, Texas 75201

Re:     Rooftop USA

Dear Mr. McClung:

As you are aware, we represent TriCon Logistics LLC ("TriCon"). I write on behalf of TriCon in response to your August 19, 2019 email to my law partners, Carey Schreiber and David Lange. Your email attached a temporary restraining order ("Order") obtained by your client Triumphant Gold Limited ("TGL") against Rooftop Group Services (US) Inc. and Rooftop Group USA, Inc. (collectively, "Rooftop USA").

Although you describe the Order as "enjoining Rooftop USA from taking various actions that would affect Triumphant Gold Limited's rights as a creditor," your email also claims that the Order enjoins "a private sale of Rooftop USA's inventory that was previously noticed by your client TriCon Logistics, LLC, to be held on or after Tuesday, August 20, at 1:00 pm." Why you claim the Order enjoins TriCon's sale is unclear. As you are well aware, pursuant to the Notice of Private Sale of Stored Goods Under Texas Uniform Commercial Code dated August 8, 2019 (the "UCC Sale Notice") that we provided you last week, *TriCon, as a secured creditor* (and not *Rooftop USA*) is foreclosing on its first priority valid lien on *TriCon's collateral* and is conducting a sale process pursuant to the Texas Uniform Commercial Code to liquidate its collateral, which it now has the right to sell at a private sale on or after 1:00 p.m. today (the "UCC Sale").

As discussed in greater detail below, the Order simply does not apply to the UCC Sale. Your client's suggestion that the Order applies appears to be a deliberate attempt to tortiously interfere with TriCon's sale process under the UCC Sale Notice and to gain some sort of tactical advantage. Moreover, this is merely the latest example of the sharp practices your client has employed, whether in the chapter 11 case of Rooftop Group International Pte. Ltd. (the "Debtor") Case No. 19-31443-hdh11 pending in the United States Bankruptcy Court for the Northern District of Dallas (the "Bankruptcy Court"), or in case against Rooftop USA pending in the 101st Judicial District Court of Dallas County (the "State Court"). Your tactics include filing pleadings with inaccurate statements about TriCon and repeated failures to give notice to TriCon of those pleadings. We demand that TGL immediately cease and desist from these and any future attempts to abuse the legal system to tortiously interfere with TriCon's rights, including with

**EXHIBIT J**



August 20, 2019
Page 2

respect to the UCC Sale Notice and UCC Sale. We also demand that TGL promptly correct the factual misstatements in your pleadings in the State Court.

### *The Order does not enjoin TriCon's sale under the UCC Sale Notice.*

The Order does not prevent TriCon from proceeding with the UCC Sale in accordance with the UCC Sale Notice. TriCon is not a party to the action you filed in State Court. Nor does the Order enjoin TriCon. The Order specifically enjoins only "Defendants and their agents, servants, employees, representatives, any entity in which they own a controlling interest, and all those acting in concert with them." As you well know, TriCon does not fall under any of those categories.

TriCon is neither one of the named Defendants, nor an agent, employee, representative, or affiliate of the named Defendants. And it is certainly not acting in concert with them. As set forth in the documents that TriCon voluntarily provided you over a week ago, TriCon, at all times, acted at arms' length to the named Defendants. In that regard, TriCon is acting adversely to Rooftop USA, foreclosing on a lien for an unpaid debt. Nor do you have any evidence to the contrary. Accordingly, TriCon is not enjoined by the Order from, among other things, closing on the UCC Sale as set forth the UCC Sale Notice.

### *TGL has violated its duty of candor to the Court.*

The Dallas County Local Rules require you to give notice to a party's counsel of an application for a temporary restraining order. You knew that TriCon was represented by counsel—after all, you had communicated with Mr. Schreiber on multiple occasions over the past week and had subpoenaed, and received, information from TriCon. Nor do any of the exceptions to giving notice apply here. TriCon is not insolvent and there is no basis for assuming that providing TriCon notice of a temporary restraining order would have precipitated any imminent harm. In fact, as you point out, the UCC Sale was not even set to begin until 1 p.m. on August 20 as set forth in the UCC Sale Notice that you attached to your pleadings, *one day after* your purported emergency hearing. There was no impediment, therefore, to you providing notice of a temporary restraining order last week when the Bankruptcy Court denied your extreme relief, or the day of the hearing on the temporary restraining order (yesterday).

TriCon has been extremely cooperative with TGL, as demonstrated by its voluntarily agreeing to produce all the documents you have demanded to date. And those documents, as well as the information that you filed in the Bankruptcy Court and State Court, demonstrate conclusively that TriCon is foreclosing on its collateral, not any of TGL's collateral. They also show that TriCon was pursuing an arm's length UCC Sale process. Your failure to disclose this information to the Court and the assertions in your pleadings to the contrary fail to satisfy your duty of candor with the Court.

Significantly, you hid the fact that you and your client had pursued and lost the very same issue in the Bankruptcy Court. While you cite to two Bankruptcy Court hearings, you omit the most relevant one— the third hearing that occurred just last Friday, at which time your relief was denied. Incredibly, you sought relief in the Bankruptcy Court to extend the automatic stay of the Debtor to assets of Rooftop USA, a non-Debtor, and to enjoin, among others, TriCon, without notice to TriCon. At the same time, you were in communication with Mr. Schreiber, yet you failed to mention this fact to him. Clearly your



August 20, 2019
Page 3

aim was solely to disrupt TriCon's UCC Sale of its collateral while depriving TriCon any opportunity to object. All the same, the Bankruptcy Court denied your client's motion at the hearing on August 16, 2019. Your State Court case appears to be a direct response to this adverse decision—an attempt at a second bite at the apple—yet you did not mention this hearing in your application for a temporary restraining order.

### *Demand for reasonable notice going forward*

If your client intends to seek relief from any court against TriCon going forward, I strongly caution you to comply with the applicable rules of procedure by providing us with reasonable advance notice. Your client has demonstrated a pattern of filing motions to interfere with TriCon's rights without providing TriCon any notice or meaningful ability to participate in the proceedings. Your approach has been highly wasteful, causing TriCon to incur costs and expenses. TriCon reserves the right to recover those costs and seek sanctions for TGL's conduct.

### *Continued interference not only damages TriCon, but TGL as well*

Finally, we note that it is in everyone's interest to allow the sale to proceed. If TGL continues to interfere with the UCC Sale and scares off buyers, it will impair the value of assets being sold, and will create significant liability for TGL for tortiously interfering with the UCC Sale.

You imply in your pleadings, without any evidence, that TriCon is working in concert with Rooftop USA to sell the assets to an "unknown party," suggesting that it is related to an alleged practice by Mr. Matloff of using Rooftop USA's assets to fund his personal expenses. That is untrue. To be clear, TriCon is working independently and is seeking to sell its collateral to reputable liquidators who are not affiliated with Rooftop USA or the Debtor. Nor will Rooftop USA or the Debtor obtain any of the proceeds. You have no basis to suggest otherwise.

To maximize the collateral's value, TriCon must act now to engage a liquidator that will market the products in anticipation of the upcoming holiday season. To the extent TGL can demonstrate a legal basis for asserting an interest in the proceeds of the sale (which to date it has failed to do), that can be addressed at a later time and can be easily remedied. However, there is no basis for an equitable remedy against TriCon. TriCon reserves all of its rights, both at law and in equity.

Sincerely,

Basheer Ghorayeb



**Corporate Headquarters:**
4450 W. Walnut Hill Lane, Suite 100
Irving, TX 75038
USA
(972) 456-1581 (Tel)
www.tricon-logistics.com

**Mailing Address:**
PO Box 612369
DFW Airport, TX 75261
USA

epictogether@tricon-logistics.com

——— EPIC. Together. ———

TAX #:

# STATEMENT OF ACCOUNT

ROOFTOP GROUP USA INC DBA ROOFTOP BRANDS
ATTENTION: SHULY RAMIREZ
5218 SPRUCE STREET, BELLAIRE, TEXAS 77401
8619 WALL ST STE 400
AUSTIN TX 78754

**ACCOUNT: ROOUSAAKU**
**CURRENCY: USD**
PAGE: 1 of 3
DATE: 05-Sep-19
STD TERMS: Cash on Delivery
DSB TERMS: Cash on Delivery
THIS STATEMENT IS FOR ITEMS TO: 25-Aug-19

| | TRANSACTION | DATE | DESCRIPTION | DUE DATE | INV. AMT | BALANCE | TOTAL |
|---|---|---|---|---|---|---|---|
| INV | SSEADS00092113 | 02-Nov-18 | HOUSE: YYFSZ1809037 PAYMENT REF: 00002731 | 02-Dec-18 | 419.26 | 419.26 | 419.26 |
| INV | SSEADS00092148 | 02-Nov-18 | HOUSE: SBIE1800032 PAYMENT REF: 00002735 | 02-Dec-18 | 1,897.04 | 1,897.04 | 2,316.30 |
| INV | SSEADS00091970 | 02-Nov-18 | HOUSE: YYFSZ1809021/020 PAYMENT REF: 00002736 | 02-Dec-18 | 1,773.33 | 1,773.33 | 4,089.63 |
| INV | SSEADS00091944 | 02-Nov-18 | HOUSE: YYFSZ1809025 PAYMENT REF: 00002737 | 02-Dec-18 | 1,758.52 | 1,758.52 | 5,848.15 |
| INV | SSEADS00092154 | 02-Nov-18 | HOUSE: SBIE18100001 PAYMENT REF: 00002738 | 02-Dec-18 | 548.01 | 548.01 | 6,396.16 |
| INV | SSEADS00092257 | 07-Nov-18 | HOUSE: SEADS-00092257 PAYMENT REF: 00002788 | 07-Dec-18 | 716.76 | 716.76 | 7,112.92 |
| INV | SSEADS00092045 | 08-Nov-18 | HOUSE: SEADS-00092045 PAYMENT REF: 00002792 | 08-Dec-18 | 1,657.08 | 1,657.08 | 8,770.00 |
| INV | SSEADS00092404 | 15-Nov-18 | HOUSE: SEADS-00092404 PAYMENT REF: 00002921 | 15-Dec-18 | 1,447.22 | 1,447.22 | 10,217.22 |
| INV | SSEADS00092410 | 15-Nov-18 | HOUSE: OSTISZTIW18A0346 PAYMENT REF: 00002922 | 15-Dec-18 | 838.52 | 838.52 | 11,055.74 |
| INV | SSEADS00092442 | 16-Nov-18 | HOUSE: YYFSZ1810002 PAYMENT REF: 00002939 | 16-Dec-18 | 616.76 | 616.76 | 11,672.50 |
| INV | SSEADS00091345 | 20-Nov-18 | HOUSE: YYFSZ1808032 PAYMENT REF: 00002991 | 20-Dec-18 | 1,867.00 | 1,867.00 | 13,539.50 |
| INV | SSEAIA00092629 | 27-Nov-18 | HOUSE: HVHA18110037 PAYMENT REF: 00003057 | 27-Dec-18 | 835.70 | 835.70 | 14,375.20 |
| INV | I00007242 | 30-Nov-18 | PAYMENT REF: 00003224 | 30-Dec-18 | 10,638.39 | 10,638.39 | 25,013.59 |
| INV | I00007207 | 30-Nov-18 | PAYMENT REF: 00003264 | 30-Dec-18 | 48,969.38 | 39,073.67 | 64,087.26 |
| INV | SSEADS00092919 | 14-Dec-18 | HOUSE: SEADS-00092919 PAYMENT REF: 00003466 | 13-Jan-19 | 963.73 | 963.73 | 65,050.99 |
| INV | SSEAIA00092916 | 21-Dec-18 | HOUSE: HVHA18110183 PAYMENT REF: 00003623 | 20-Jan-19 | 861.00 | 861.00 | 65,911.99 |
| INV | I00007254 | 28-Dec-18 | PAYMENT REF: 00003730 | 27-Jan-19 | 37,182.31 | 37,182.31 | 103,094.30 |
| INV | I00007260 | 31-Dec-18 | PAYMENT REF: 00003846 | 30-Jan-19 | 38,717.14 | 38,717.14 | 141,811.44 |
| INV | I00007265/B | 31-Dec-18 | PAYMENT REF: 00003829 | 30-Jan-19 | 14,297.32 | 14,297.32 | 156,108.76 |
| INV | SSEADS00093265 | 08-Jan-19 | HOUSE: YYFSZ1811038 PAYMENT REF: 00003887 | 07-Feb-19 | 678.48 | 678.48 | 156,787.24 |
| INV | I00007385 | 31-Jan-19 | PAYMENT REF: 00004529 | 02-Mar-19 | 6,070.45 | 6,070.45 | 162,857.69 |
| INV | I00007334 | 01-Feb-19 | PAYMENT REF: 00004628 | 03-Mar-19 | 122,115.99 | 122,115.99 | 284,973.68 |
| INV | SSEAIA00094129 | 04-Feb-19 | HOUSE: 731-92488001 PAYMENT REF: 00004767 | 06-Mar-19 | 352.76 | 352.76 | 285,326.44 |
| INV | SSEADS00093986 | 19-Feb-19 | HOUSE: YYFSZ1901009 PAYMENT | 21-Mar-19 | 671.97 | 671.97 | 285,998.41 |

EXHIBIT K

Continued Over…



**Corporate Headquarters:**
4450 W. Walnut Hill Lane, Suite 100
Irving, TX 75038
USA
(972) 456-1581 (Tel)
www.tricon-logistics.com

**Mailing Address:**
PO Box 612369
DFW Airport, TX 75261
USA

epictogether@tricon-logistics.com

—— EPIC. Together. ——

TAX #:

# STATEMENT OF ACCOUNT

ROOFTOP GROUP USA INC DBA ROOFTOP BRANDS
ATTENTION: SHULY RAMIREZ
5218 SPRUCE STREET, BELLAIRE, TEXAS 77401
8619 WALL ST STE 400
AUSTIN TX 78754

**ACCOUNT: ROOUSAAKU**
**CURRENCY: USD**
PAGE: 2 of 3
DATE: 05-Sep-19
STD TERMS: Cash on Delivery
DSB TERMS: Cash on Delivery
THIS STATEMENT IS FOR ITEMS TO: 25-Aug-19

| TRANSACTION | | DATE | DESCRIPTION | DUE DATE | INV. AMT | BALANCE | TOTAL |
|---|---|---|---|---|---|---|---|
| | | | REF: 00005362 | | | | |
| INV | I00007435 | 26-Feb-19 | PAYMENT REF: 00005739 | 28-Mar-19 | 52,513.41 | 52,513.41 | 338,511.82 |
| INV | I00007467 | 28-Feb-19 | PAYMENT REF: 00005835 | 30-Mar-19 | 6,289.31 | 6,289.31 | 344,801.13 |
| INV | I00007453 | 28-Feb-19 | PAYMENT REF: 00005973 | 30-Mar-19 | 35,477.16 | 35,477.16 | 380,278.29 |
| INV | SSEAIA00094989 | 06-Mar-19 | PAYMENT REF: 00006091 | 05-Apr-19 | 638.00 | 638.00 | 380,916.29 |
| INV | I00007499 | 27-Mar-19 | PAYMENT REF: 00007141 | 26-Apr-19 | 72,400.98 | 72,400.98 | 453,317.27 |
| INV | I00007531 | 29-Mar-19 | PAYMENT REF: 00007438 | 28-Apr-19 | 46,929.36 | 46,929.36 | 500,246.63 |
| INV | I00007554 | 02-Apr-19 | PAYMENT REF: 00007566 | 02-May-19 | 6,700.82 | 6,700.82 | 506,947.45 |
| INV | W00620722 | 02-Apr-19 | PAYMENT REF: 00007583 | 02-May-19 | 295.00 | 295.00 | 507,242.45 |
| INV | SSEADO00096419 | 15-Apr-19 | HOUSE: SEADO-0096419 PAYMENT | 15-May-19 | 295.00 | 295.00 | 507,537.45 |
| | | | REF: 00008370 | | | | |
| INV | I00007569 | 19-Apr-19 | PAYMENT REF: 00008661 | 19-May-19 | 21,945.39 | 21,945.39 | 529,482.84 |
| INV | I00007638 | 30-Apr-19 | PAYMENT REF: 00009314 | 30-May-19 | 6,100.07 | 6,100.07 | 535,582.91 |
| INV | I00007622 | 30-Apr-19 | PAYMENT REF: 00009419 | 30-May-19 | 37,140.57 | 37,140.57 | 572,723.48 |
| INV | I00007622/A | 30-Apr-19 | PAYMENT REF: 00009427 | 30-May-19 | 1,477.06 | 1,477.06 | 574,200.54 |
| INV | SSEADS00096364 | 01-May-19 | HOUSE: YYFSZ1903033 PAYMENT | 31-May-19 | 848.14 | 848.14 | 575,048.68 |
| | | | REF: 00009457 | | | | |
| INV | I00007667 | 20-May-19 | PAYMENT REF: 00010451 | 19-Jun-19 | 12,132.65 | 12,132.65 | 587,181.33 |
| INV | I00007706 | 31-May-19 | PAYMENT REF: 00011325 | 30-Jun-19 | 26,334.46 | 26,334.46 | 613,515.79 |
| INV | I00007744 | 31-May-19 | PAYMENT REF: 00011253 | 30-Jun-19 | 6,030.24 | 6,030.24 | 619,546.03 |
| INV | W00615885 | 31-May-19 | PAYMENT REF: 00011453 | 30-Jun-19 | 18.92 | 18.92 | 619,564.95 |
| INV | I00007765 | 25-Jun-19 | PAYMENT REF: 00012656 | 25-Jul-19 | 5,608.65 | 5,608.65 | 625,173.60 |
| INV | I00007765/A | 25-Jun-19 | PAYMENT REF: 00012659 | 25-Jul-19 | 1,203.05 | 1,203.05 | 626,376.65 |
| INV | I00007793 | 25-Jun-19 | PAYMENT REF: 00012660 | 25-Jul-19 | 2,721.42 | 2,721.42 | 629,098.07 |
| INV | I00007807 | 28-Jun-19 | PAYMENT REF: 00013302 | 28-Jul-19 | 8,061.31 | 8,061.31 | 637,159.38 |
| INV | I00007827 | 28-Jun-19 | PAYMENT REF: 00013293 | 28-Jul-19 | 6,042.71 | 6,042.71 | 643,202.09 |
| INV | I00007876 | 31-Jul-19 | PAYMENT REF: 00015212 | 30-Aug-19 | 91,822.19 | 91,822.19 | 735,024.28 |
| INV | I00007853 | 31-Jul-19 | PAYMENT REF: 00015271 | 30-Aug-19 | 8,800.39 | 8,800.39 | 743,824.67 |

Continued Over...



**Corporate Headquarters:**
4450 W. Walnut Hill Lane, Suite 100
Irving, TX 75038
USA
(972) 456-1581 (Tel)
www.tricon-logistics.com

**Mailing Address:**
PO Box 612369
DFW Airport, TX 75261
USA

epictogether@tricon-logistics.com

EPIC. Together.

TAX #:

# STATEMENT OF ACCOUNT

ROOFTOP GROUP USA INC DBA ROOFTOP BRANDS
ATTENTION: SHULY RAMIREZ
5218 SPRUCE STREET, BELLAIRE, TEXAS 77401
8619 WALL ST STE 400
AUSTIN TX 78754

**ACCOUNT: ROOUSAAKU**
**CURRENCY: USD**
PAGE: 3 of 3
DATE: 05-Sep-19
STD TERMS: Cash on Delivery
DSB TERMS: Cash on Delivery
THIS STATEMENT IS FOR ITEMS TO: 25-Aug-19

---

**Overdue at statement date: 743,824.67 USD**

| | |
|---|---|
| **TOTAL USD** | 743,824.67 |

---

**Bank Payments To:**

| | | | |
|---|---|---|---|
| **Bank** | 111000753 | **SWIFT:** MNBDUS33 | |
| **Account** | 1883046839 | | |
| COMERICA BANK - TEXAS | | | |
| 8828 STEMMONS FRWY, DALLAS TX 75247 | | | |
| **Pay Ref** | ROOUSAAKU | | |
| **Due** | USD 743,824.67 | | |

**Mail Payments To:**

TRICON LOGISTICS LLC
PO BOX 671711
DALLAS TX 75267-1711
UNITED STATES